# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION )
800 K Street, N.W., Suite 1000 )
Washington, D.C.  20001 )
 )
    Plaintiff, )
 )
 )
   v. )  Case No. 1:25-cv-00170
 )
DONALD J. TRUMP, )  COMPLAINT FOR
President of the United States, )  DECLARATORY AND
The White House )  INJUNCTIVE RELIEF
1600 Pennsylvania Avenue, N.W. )
Washington, D.C.  20500, )
 )
CHARLES EZELL, )
Acting Director, )
Office of Personnel Management )
1900 E Street, N.W. )
Washington, D.C. 20415, )
 )
PETE R. FLORES, )
Senior Official Performing the Duties of )
Commissioner, )
U.S. Customs and Border Protection )
U.S. Department of Homeland Security )
1300 Pennsylvania Avenue, )
Washington, D.C. 20004, )
 )
DOUGLAS O'DONNELL, )
Acting Commissioner, Internal Revenue Service )
U.S. Department of Treasury )
1500 Pennsylvania Avenue, N.W. )
Washington, D.C. 20220, )
 )
DOROTHY FINK, Acting Secretary )
U.S. Department of Health and )
Human Services )
200 Independence Avenue, S.W. )
Washington, D.C. 20201, and )
 )

MARK T. UYEDA,                                    )
Acting Chair,                                     )
Securities and Exchange Commission               )
100 F Street, N.E.                                )
Washington, D.C. 20549,                           )
                                                  )
                              Defendants.          )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents federal government employees in 37 agencies and departments in grievances and litigation. NTEU also negotiates collective bargaining agreements with agency employers, pushes for legislation that improves the working lives of federal employees, and engages in general advocacy for federal employees' rights. NTEU's mission is to ensure that federal employees are treated with dignity and respect.

On January 20, 2025, Defendant Donald J. Trump issued an executive order that attempts to strip civil service and due process protections from a large swath of federal employees, including many that NTEU represents. Executive Order, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce* (Jan. 20, 2025). The Policy/Career Executive Order reinstates Executive Order No. 13957 (October 21, 2020, which created a new excepted service Schedule F. The Policy/Career Executive Order directs agencies to move numerous employees into a new excepted service category with the goal that many would then be fired.

2

Congress has enacted comprehensive legislation governing the hiring and employment of federal employees. When establishing hiring principles, Congress determined that most federal government jobs be in the merit-based, competitive service. And it established that most federal employees have due process rights if their agency employer wants to remove them from employment. Because the Policy/Career Executive Order attempts to divest federal employees of these due process rights, it is contrary to congressional intent. It is also directly contrary to Office of Personnel Management (OPM) regulations. The Career/Policy Executive Order is thus *ultra vires* and must be enjoined.

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.      Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is located in Washington, D.C. Defendants also reside here, and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C. because the Executive Order was issued here.

## PARTIES

3.      Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street, N.W., Suite 1000, Washington, D.C. 20001. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of tens of thousands of federal employees in 37 departments and agencies. NTEU represents the interests of these

employees by enforcing employees' collective and individual rights through grievances and federal court litigation; negotiating collective bargaining agreements; filing unfair labor practice charges; and advocating in Congress for favorable working conditions, pay, and benefits.

4.     NTEU brings this action on behalf of itself because it has been directly harmed by the Executive Order.

5.     Defendant Donald J. Trump, in his official capacity as President of the United States of America, issued the Schedule F Executive Order.

6.     The Order directs Defendant Charles Ezell, in his official capacity as Acting Director of the Office of Personnel Management (OPM), to approve or to revise the lists of positions that agencies designate to be transferred to the new excepted service schedule. Defendant Ezell is also directed to promptly rescind certain existing OPM regulations entitled "Upholding Civil Service Protections and Merit System Principles" which were proposed on April 9, 2024, and published at 89 Fed. Reg. 24982.

7.     The Order directs Defendant Pete R. Flores, in his official capacity as Senior Official Performing the Duties of Commissioner of the U.S. Customs and Border Protection, to decide which agency positions should be transferred to the new excepted service schedule and to petition OPM within required time frames to place these positions within the new excepted service schedule.

8.     The Order directs Defendant Douglas O'Donnell, in his official capacity as Acting Commissioner of the Internal Revenue Service, to decide which agency

positions should be transferred to the new excepted service schedule and to petition OPM within required time frames to place these positions within the new excepted service schedule.

9.      The Order directs Defendant Dorothy Fink, in his official capacity as Acting Secretary for the U.S. Department of Health and Human Services, to decide which agency positions should be transferred to the new excepted service schedule and to petition OPM within required time frames to place these positions within the new excepted service schedule.

10.     The Order directs Defendant Mark T. Uyeda, in his official capacity as Acting Chair of the Securities and Exchange Commission, to decide which agency positions should be transferred to the new excepted service schedule and to petition OPM within required time frames to place these positions within the new excepted service schedule.

## STATEMENT OF CLAIMS

### I.   Congress's Creation of a Broad Competitive Service and a Narrow Excepted Service.

11.     All employees in the executive branch of the federal government are in the competitive service, the excepted service, or the Senior Executive Service. 5 U.S.C. §§ 2102(a)(1), 2103(a); *see generally NTEU v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988).

12.     The present-day competitive civil service dates back more than 130 years to the Pendleton Civil Service Reform Act, which eliminated the spoils system and established a merit-based, competitive system for the appointment of federal

employees. *See* 89 Fed. Reg. 24982 (Apr. 9, 2024) (summarizing evolution of civil service reform laws).

13.    Thus, the "competitive service [is] the norm rather than the exception." *NTEU v. Horner*, 854 F.2d at 492. OPM has explained that "most government employees are in the competitive service." *See* 89 Fed. Reg. 24988 (Apr. 9, 2024).

14.    Applicants for employment in the competitive service must go through a competitive hiring process (i.e., competitive examining). *See* OPM, *Competitive Hiring, https://www.opm.gov/policy-data-oversight/hiring-information/competitive-hiring/;* 5 C.F.R. Part 337.

15.    Applicants for excepted service positions are generally "excepted" from competitive service hiring requirements, such as taking a competitive examination. 5 C.F.R. § 6.1(a).

16.    There is a subset of excepted service employees "whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character" and whom "the President has excepted from the competitive service." 5 U.S.C. § 7511(b)(2).

17.    The statutory term "confidential, policy-determining, policy-making, or policy-advocating" applies to the narrow category of noncareer, political appointments that are identified by "a close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President." *See* 5 C.F.R. § 210.102(b)(3),

(b)(4). Such employees have "no expectation of continued employment beyond the [relevant] presidential administration." *Id.*

18.     The legislative history of the Civil Service Reform Act (CSRA) confirms that "confidential, policy-determining, policy-making, or policy-advocating employees" means only noncareer, political appointees. *See* S. Rep. No. 95-969, at 48 (1978), reprinted in 1978 U.S.C.C.A.N. 2723, 2770 (describing confidential, policy employees as "appointments confirmed by the Senate").

19.     Merit Systems Protection Board precedent and related statutes reinforce this interpretation. *See O'Brien v. Office of Independent Counsel*, 74 M.S.P.R. 192, 206 (1997) (confidential, policy employees is "a shorthand way of describing positions to be filled by 'political appointees'") (citing *Special Counsel v. Peace Corps*, 31 M.S.P.R. 225, 231 (1986)); 5 U.S.C. § 9803 (defining "political appointee" as including individuals in "confidential, policy-determining, policy-making or policy-advocating" positions).

## II.     Congress's Grant of Due Process Protections to Most Federal Employees.

20.     By law, most non-probationary employees in the competitive and excepted service have due process rights if an agency takes an "adverse action" against them. Congress has defined an "adverse action" as a removal, suspension for more than 14 days, a reduction in grade or pay, or a furlough of 30 days or less. 5 U.S.C. § 7512. Employees' due process rights include the right to notice of the proposed action, to respond, and to pursue appeals before the Merit Systems Protection Board. 5 U.S.C. §§ 7511-13, 7701.

21.     Non-probationary public employees have a constitutionally based property interest in continuing employment and such employment cannot be denied or stripped away without honoring due process rights, such as notice and an opportunity to respond. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985). *See also Stone v. FDIC*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) ("If the government gives a public employee assurances of continued employment or conditions dismissal only for specific reasons, the public employee has a property interest in continued employment.").

22.     "[T]he procedures required by 5 U.S.C. § 7513(b) [of the adverse action statute] reflect the requirements of constitutional due process." *Kriner v. Dep't of the Navy*, 61 M.S.P.R. 526, 531 (1994).

23.     Consistent with Congress's statutory scheme and case law, OPM has explained that most non-probationary employees have a "a vested property interest in . . . continued employment" and any new law effecting removals or other adverse actions "must comport with due process." 89 Fed. Reg. 24987 (Apr. 9, 2024).

24.     Employees carry their due process rights with them if they are involuntarily moved from the competitive service, or from another excepted service schedule, into a new schedule. 5 C.F.R. § 752.201(c), (d)(2). *See* 89 Fed. Reg. 24983 (Apr. 9, 2024) (non-probationary employees "retain the rights previously accrued upon an involuntary move from the competitive service to the excepted service, or from one excepted service schedule to another. . .").

25.     The adverse action statute providing due process rights expressly excludes the subset of excepted service employees "whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character" and whom "the President has excepted from the competitive service." 5 U.S.C. § 7511(b)(2). Because this subset of excepted employees (which, as explained above, means career, political appointees) has no expectation of continued employment beyond the relevant presidential administration, they do not have constitutionally based due process rights. *See* 89 Fed. Reg. 24983 n.7 (Apr. 9, 2024) (explaining that political appointees have no expectation of accrued rights).

### III.    The President's Executive Order.

#### A.    By congressional limitation, the President can create only narrowly defined excepted service schedules.

26.     The President may generally establish rules that govern federal employees in the competitive service. 5 U.S.C. § 3302.

27.     But Congress limited the President's authority to remove employees or positions from the competitive service. Congress authorized the President to make "necessary exceptions of positions from the competitive service" only when warranted by "conditions of good administration." 5 U.S.C. § 3302.

28.     Presidents have previously issued Executive Orders creating Schedules A, B, C, D and E, as necessary exceptions to the competitive service. 5 C.F.R. § 6.2.

29.      Schedules A, B, C, D, and E were "designed to address unique hiring needs upon a determination that appointments through the competitive service was 'not practicable.'" 89 Fed. Reg. 24990 (Apr. 9, 2024).

30.    In contrast, OPM concluded that a Schedule F Executive Order issued in 2020 (Exec. Order No. 13957, 85 Fed. Reg. 67631 [Oct. 26, 2020]), which is revived through the Order challenged here, "was designed to be broad and numerically unlimited." 89 Fed. Reg. 24990 (Apr. 9, 2024).

B.    **The Executive Order exceeds the lawful definition of "confidential" and "policy" positions.**

31.    The January 20, 2025 Executive Order creates a new excepted service schedule that adds to the excepted service "[p]ositions of a confidential, policy-determining, policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition." Exec. Order, § 2 (reinstating Exec. Order 13957).

32.    The Executive Order explains that, while some federal employees are "expected to resign upon a Presidential transition," the Order covers employees who "are *not* normally subject to change as a result of a Presidential transition." Exec. Order, § 2  (reinstating Exec. Order 13957) (emphasis added).

33.    The Order thus expressly applies to "career" employees because career employees do not normally change the status of their employment after a Presidential transition.

34.    Yet the longstanding definition of a "confidential, policy-determining, policy-making, or policy-advocating" position is one "exclusively associated with a *noncareer* political appointment." 5 C.F.R. §§ 210.102(b)(3), (b)(4) (emphasis added) (clarifying the definition*). See also* 89 Fed. Reg. 24983 (Apr. 9, 2024).

10

35.     To the extent that the President's agency heads apply the Executive Order to include career employees, their actions are contrary to law and regulation. 5 C.F.R. §§ 210.102(b)(3), (b)(4).

36.     The Executive Order challenged here is worded similar to previously issued Executive Order 13957 (85 Fed. Reg. 67631 [Oct. 26, 2020]). In response to the October 2020 Schedule F Executive Order, agencies broadly and unlawfully interpreted the Order as covering career employees.

37.     For example, the Office of Management and Budget, in response to Executive Order 13957, petitioned OPM on November 20, 2020 and on January 5, 2021, to include a majority of its workforce in Schedule F. GAO, *Civil Service-Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category for Federal Positions* (Sept. 2022) (https://www.gao.gov/assets/gao-22-105504.pdf). *See* Erich Wagner, *OMB Reportedly Designated 88% of its Workforce for Schedule F*, Government Executive, (https://www.govexec.com/management/2020/11/omb-reportedly-designates-88-its-employees-schedule-f/170275/) (Nov. 23, 2020).

38.     The President's agency heads, including Defendants Ezell, Flores, O'Donnell, Fink, and Uyeda, will follow the 2025 Executive Order's mandate to include career employees in the new excepted service schedule.

**C.**    **The Executive Order lacks justification for why it is allowable under the Statute.**

39.    Presidents can only except employees or positions from the competitive service if "necessary" and when warranted by "conditions of good administration." 5 U.S.C. § 3302.

40.    The Executive Order provides no details, data, or explanation for why it is necessary.

41.    The Order similarly fails to provide details, data or explanation why conditions of good administration" warrant changes to hiring or adverse action procedures. It asserts only unsupported generalities such as "[p]rinciples of good administration . . . necessitate action." Exec. Order § 1.

**D.**    **Federal agencies are required to expeditiously create lists of positions to be moved into a new excepted service schedule to pave the way for employees to be terminated without receiving their statutory due process rights.**

42.    The Executive Order directs each agency head to "conduct, within 90 days of the date of th[e] order, a preliminary review of agency positions . . . and [to] conduct a complete review of such positions within 210 days . . ." to determine which positions should be transferred to the new excepted service schedule.

43.    Following this preliminary review, each agency head is required to recommend that the President move such positions from the competitive service or from Schedules A, B, or D positions into the new excepted service schedule.

44.     The 2020 Order, which the Order reinstates, stated that it "shall apply to currently existing positions and newly created positions [that fall within the Order's definition of covered employee]."

45.     The Order purports to exempt "such positions" from the "adverse action procedures set forth in chapter 75 of title 5, United States Code."

46.     The 2020 Order, which this Order reinstates, repeatedly discussed agency employers' alleged need to make conditions easier to terminate federal employees. It asserts that employees in positions covered by the Order should be exempted from adverse action protections because "removing poorly performing employees [can be] difficult."

47.     The 2020 Order, which this Order reinstates, also stated that agencies "need the flexibility to expeditiously remove poorly performing employees from these positions without facing extensive delays or litigation."

48.     It is substantially likely that the President's agency heads, including Defendants Ezell, Flores, O'Donnell, Fink, and Uyeda, will "expeditiously remove" employees whose positions are shifted to the new excepted service schedule without providing them with the statutory due process rights that employees have accrued. To deny shifted employees their accrued due process rights is contrary to law and regulation. 5 C.F.R. § 752.401.

   **E.   The Executive Order is contrary to OPM regulations which impose limitations on transferring any positions into a new excepted service schedule.**

49. OPM regulations require agencies to take certain steps before shifting any position into a new excepted service schedule. These required steps include identifying the types, numbers, and locations of positions to be moved to the new excepted service schedule; documenting the basis for any determination that movement of the position into the new excepted service schedule is consistent with standards set by the President; and obtaining certification from agency Chief Human Capital Officers that moving the positions into a new excepted service schedule is consistent with merit system principles. *See* 5 C.F.R. § 302.602(b).

50. OPM regulations also require that agencies give advanced, written notice to any employee whose position is to be moved into a new excepted service schedule. This written notice must inform the employee that the employee maintains accrued civil service protections. *See* 5 C.F.R. § 302.602(c).

51. The Executive Order requires OPM and agencies to comply with the Order's requirements, including those that conflict with the requirements described above. The Order thus directs agencies to act contrary to regulations. *See* 5 C.F.R. § 302.602(b).

F. **OPM is directed to implement the Executive Order promptly.**

52. The Executive Order requires the OPM Director to act promptly on agency designations of positions to be moved into the new excepted service schedule.

53. The Order also directs the OPM Director to "adopt such regulations as the Director determines may be necessary to implement this order" and to "provide

14

guidance on conducting a swift, orderly transition from existing appointment processes" for the new excepted service employees.

54.    Defendant Ezell is substantially likely to effectuate transfers of employees to the new excepted service schedule that would be unlawful because the Executive Order conflicts with statute and regulations.

**IV.    The Harm that NTEU Will Suffer Due to the Executive Order.**

55.    NTEU brings this action on behalf of itself because the Executive Order immediately harms NTEU by requiring it to spend time and resources to counteract the effects of the Order.

56.    The Executive Order will radically reshape the civil service by drastically increasing the number and type of employees who are in a new category of excepted service and be at risk of dismissal without adverse action rights.

57.    The Executive Order by its terms will not only apply to future employees, but will also apply to incumbent employees who have been hired into the competitive service or into previously existing excepted service categories. These incumbent employees accepted their jobs with the expectation that once a probationary period had passed, they had civil service and due process protections attendant to their appointment. The Order intends that such employees can be involuntarily moved to the new excepted service schedule and stripped of those due process protections.

58.    The radical change that this Executive Order will effect has been widely recognized. The October 2020 Schedule F Order that was revived through

15

this Executive Order was described "as a 'stunning' attempt to politicize the civil service and undermine more than a century of laws aimed at preventing corruption and cronyism in the federal government." Erich Wagner, "*Stunning" Executive Order Would Politicize Civil Service*, (Oct. 22, 2020), govexec.com (https://www.govexec.com/management/2020/10/stunning-executive-order-would-politicize-civil-service/169479/)

59.    The 2020 Executive Order would have given the President "the power to mount a scorched-earth campaign" and gives him "largely unfettered authority to fire experts . . . while leaving behind a corps of embedded loyalists to undermine his successor." Andrew Feinberg, *Trump Just Quietly Passed an Executive Order that Could Destroy a Future Biden Administration*, theindependent.co.uk (Oct. 23, 2020) (https://www.independent.co.uk/voices/trump-executive-order-civil-service-biden-election-schedule-f-b1255692.html).

60.    An Executive Order like the one issued in 2020 "would effectively upend the modern civil service, and put future presidents in the position of bringing in their own loyalists. . . ." Axios, *How Trump Could Reimpose "Schedule F" in 2025* (July 22, 2022) (https://www.axios.com/2022/07/22/trump-presidency-schedule-f-federal-employees).

61.    Typically, about 4,000 political appointees leave their government position at the start of a new administration. This Executive Order, which generally reinstates the one issued in 2020, is intended to cover as many as 50,000 employees, leaving them vulnerable to being fired for any reason including political agenda.

Axios, *How Trump Could Reimpose "Schedule F" in 2025*, July 23, 2022

(https://www.axios.com/2022/07/22/trump-presidency-schedule-f-federal-employees).

62.     NTEU represents thousands of federal employees who perform work

relating to policy. Given the Executive Order's improper definition of "policy-

making, policy-advocating or policy-determining, its sweep is overbroad. NTEU

must now expend scarce time and resources challenging agency efforts to include

employees within the Order's overbroad coverage. On behalf of these affected

employees, NTEU must also combat the Order's purported stripping of NTEU

members' accrued civil service and due process protections.

63.     NTEU's legislative staff, for example, is assessing the Order,

evaluating whether there is legislative action that can be taken to address it, and

communicating with Members of Congress and their staff about the Order's likely

impact on federal employees. This will entail, *inter alia*, talking with Congressional

committee staff regarding the possible insertion of language in an appropriations

bill to prohibit the use of funds to implement the January 20, 2025 Order. NTEU

staff must provide legislative language and consult frequently with Members of

Congress on the final language of any such legislation.

64.     NTEU's Legislative Department is also reaching out to congressional

staff to build support for that proposed legislative language, including

communicating with staff on appropriations, authorizing and oversight committees;

congressional leadership; offices of members of Congress whose states and districts

contain large numbers of federal employees; and other interested members of

Congress. In addition to these direct actions, NTEU's Legislative Department will respond to inquiries from Hill staff regarding the impact of the Order on NTEU-represented members.

65.    Staff in NTEU's Office of Field Operations are assessing the Order to evaluate which NTEU bargaining unit employees arguably perform work falling within the Order's wide scope and evaluating how best to protect these employees' due process rights. Given the extraordinarily broad definition of "policy-related work" contained with the Executive Order, Field Operations will spend significant time and resources on this task. This includes contacting local chapter leaders to discuss with them individual member duties and reviewing hundreds of employee position descriptions. NTEU must perform this evaluation to fulfill its statutory obligation to represent its bargaining unit employees, given the Order's instruction to agencies to identify all positions to be converted to the new excepted service schedule.

66.    NTEU's Field Operations staff is also evaluating how it will respond when agencies act on the President's directive to "expeditiously petition" the Federal Labor Relations Authority (FLRA) to determine whether any employees in the new excepted service schedule should be excluded from a collective bargaining unit. Such determinations must be made on the basis of an individual employee's assigned duties, not the employee's position description. Each such proceeding will be a fact-intensive proceeding that will explore the duties of each position. These proceedings may involve written argument or oral testimony or both. The Order's

command to send numerous petitions to the FLRA will result in a substantial expenditure of NTEU time and resources.

67.     Finally, as noted, NTEU represents tens of thousands of federal employees in 37 departments and agencies across the federal government. NTEU has litigated key issues concerning the civil service, including litigating First Amendment, due process, and other constitutional rights. As experts in this field, it will be the Union where members, the media and the public turn for help in understanding the broad scope of this Order. NTEU has been, and will continue to be, called on to explain the nuances of the Order and its adverse effects on the federal civil service. As part of that effort, NTEU's Communications and Public Relations Department must create fact sheets, draft press releases, record videos for internal member and public consumption, and provide online educational resources.

68.     NTEU's work to counteract the injury from the Executive Order is diverting and will continue to divert NTEU staff from work it would otherwise be

doing to represent employees, negotiate with agencies, and advocate to Congress on employees' behalf.

## CAUSES OF ACTION

**Count 1**:  **The President's Executive Order is unlawful and *ultra vires* because it exceeds statutory authority and is contrary to congressional intent.**

69.    Plaintiff reasserts the allegations contained in paragraphs 1 through 68 of this complaint as though contained herein.

70.    Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

71.    Congress gave the President limited authority to prescribe rules for the competitive service but expressly cabined that authority by stating that any exceptions from the competitive service must be "necessary" and "as nearly as conditions of good administration warrant." 5 U.S.C. § 3302.

72.    The Executive Order is neither necessary nor is it warranted by conditions of good administration as required by 5 U.S.C. § 3302.

73.    Reclassifying large numbers of employees in the competitive service or existing excepted service schedules into a new excepted service schedule with the intent of making them at-will employees is contrary to Congress's intent in establishing broad protections for most federal employees in the CSRA.

**Count II: The President's Executive Order is unlawful and *ultra vires* because it purports to apply to employees other than noncareer, political appointees.**

74.     Plaintiff reasserts the allegations contained in paragraphs 1 through 68 of this complaint as though contained herein.

75.     Under civil service law, a "confidential, policy-making, policy-advocating or policy-determining" position is a non-career, political appointment characterized by a close working relationship to the President or agency heads.

76.     The Executive Order covers employees beyond this narrow definition because it explicitly covers "career" employees who "are not normally subject to change as a result of a Presidential transition," and thus is contrary to law.

**Count III: The President's Executive Order is unlawful and *ultra vires* because it seeks to deprive federal employees of accrued due process rights.**

77.     Plaintiff reasserts the allegations contained in paragraphs 1 through 68 of this complaint as though contained herein.

78.     Non-probationary federal employees in the competitive service and most existing excepted service schedules acquire procedural due process rights and civil service protections grounded in the U.S. Constitution, Fifth and Fourteenth Amendments, and civil service statutes.

79.     The Executive Order seeks to move employees hired into the competitive service or existing excepted service schedules involuntarily into a new excepted service schedule where they would be stripped of their accrued due process rights, which is contrary to law and congressional intent.

**Count IV: Implementation of the Executive Order violates the Administrative Procedure Act because it unlawfully rescinds OPM regulations.**

80.    Plaintiff reasserts the allegations contained in paragraphs 1 through 68 of this complaint as though contained herein.

81.    OPM regulations define the statutory term "confidential, policy-determining, policy-making, or policy-advocating" employees narrowly as meaning only noncareer, political appointments that are identified by a close working relationship with the President, head of an agency or other key appointed officials. *See* 5 C.F.R. § 210.102(b)(3), (b)(4).

82.    OPM regulations require agencies to take certain steps before moving any position into a new excepted service, such as identifying the types, numbers, and locations of positions to be moved, documenting the basis for any determination that movement of the position is consistent with standards set by the President, and obtaining certification from agency Chief Human Capital Officers that moving positions is consistent with merit system principles. *See* 5 C.F.R. § 302.602(a).

83.    OPM regulations require that agencies give advanced, written notice to any employee whose position is to be moved into a new excepted service schedule and to inform such employee that the employee maintains accrued civil service protections. *See* 5 C.F.R. §302.602(c).

84.    The Executive Order requires OPM and agency heads to implement the Order, including aspects of the Order that conflict with the requirements described above. The Order explicitly states its view that provisions of OPM's regulations that conflict with the Order "shall be held inoperative and without

effect." This operates as a rescission of the OPM regulations without following Administrative Procedure Act procedures.

85.    The actions that Defendants Ezell, Flores, O'Donnell, Fink and Uyeda are required to take will, therefore, contravene the Administrative Procedure Act, which requires established procedures for promulgating or rescinding regulations.

## REQUEST FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff NTEU requests judgment against the defendants:

A.    Declaring that the January 20, 2025 Executive Order is unlawful.

B.    Enjoining Defendant President Trump from implementing or enforcing the January 20, 2025 Executive Order.

C.    Enjoin Defendants Ezell, Flores, O'Donnell, Fink, and Uyeda, from complying with the January 20, 2025 Executive Order.

D.    Awarding Plaintiff reasonable attorney fees and costs incurred.

E.    Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

 /s/  Julie M. Wilson
JULIE M. WILSON
General Counsel
D.C. Bar 482946


 /s/  Paras N. Shah
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881


 /s/  Allison C. Giles
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org


January 20, 2025          Attorneys for Plaintiff NTEU