**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION<br>800 K Street, N.W., Suite 1000<br>Washington, D.C.  20001,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP,<br>President of the United States,<br>The White House<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20500, and<br><br>SCOTT KUPOR,<br>Director,<br>Office of Personnel Management<br>1900 E Street, N.W.<br>Washington, D.C. 20415,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 25-cv-00170 (JMC)<br>)<br>)  AMENDED<br>)  COMPLAINT FOR<br>)  DECLARATORY<br>)  AND INJUNCTIVE<br>)  RELIEF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

__AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF__

**INTRODUCTION**

1.     Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents employees in thirty-eight federal agencies and departments. NTEU negotiates collective bargaining agreements with agency employers, pushes for legislation that improves the working lives of federal employees, and engages in general advocacy for federal employees' rights.

2.     On January 20, 2025, Defendant Donald J. Trump issued an executive order that attempts to strip civil service and due process protections from a large

swath of federal employees, including many that NTEU represents. Exec. Order No. 14, 171, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce* (Policy/Career Order) (90 Fed. Reg. 8625) (Jan. 31, 2025). The Policy/Career Order reinstated a prior Executive Order issued on October 21, 2020, which created a new excepted service Schedule F, and established a new excepted service category called Schedule Policy/Career. The 2025 Policy/Career Order, like the 2020 Order, directed agencies to move numerous employees into this new excepted service category with the goal that many would then be summarily fired.

3.    The President issued another Executive Order on June 3, 2026, which immediately placed thousands of positions (affecting approximately 8000 employees) into Schedule Policy/Career and directed agencies to notify affected employees within seven days. Exec. Order No. 14,410, *Implementing Schedule Policy/Career in the Excepted Service* (Implementing Policy/Career Order) (91 Fed. Reg. 34893) (June 3, 2026).

4.    Congress long ago enacted comprehensive legislation governing the hiring and employment of federal employees. Congress determined that most federal government jobs be in the merit-based, competitive service. It established that most federal employees, once tenured, have due process rights if their agency-employer wants to remove them from employment. And it established that most federal employees have protection from prohibited personnel practices.

5. Because the Policy/Career Order and the Implement Policy/Career Order attempt to divest federal employees of their accrued and vested rights, they contravene congressional intent, are unconstitutional, and are *ultra vires*.

6. The Office of Personnel Management (OPM) regulations issued in February 2026 to implement the Policy/Career Order are contrary to law because they too attempt to take away federal employees' accrued and vested rights.

7. The OPM regulations also fail to explain why existing statutory and regulatory procedures do not address the claimed justification for the Policy/Career Order, which is the need to remove more employees who allegedly perform poorly or who resist implementing the Administration's policies. And the OPM regulations fail to respond sufficiently to valid concerns raised by commentators.

8. The OPM regulations thus violate the Administrative Procedure Act (APA).

## JURISDICTION

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

10. Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is located in Washington, D.C. Defendants also reside here, and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C. because the Executive Orders and OPM regulations were issued here.

## PARTIES

11.      Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street, N.W., Suite 1000, Washington, D.C. 20001. NTEU, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, represents tens of thousands of federal employees in thirty-eight departments and agencies.

12.      NTEU brings this action on behalf of itself because it has been directly harmed by the Policy/Career Order, the Implementing Policy/Career Order, and the OPM regulations implementing the Policy/Career Order.

13.      The illegal acts described herein have injured NTEU's interest in protecting its members from arbitrary, capricious and other wrongful agency actions and have caused NTEU to divert and drain its resources to counteract this harm. Defendants' actions continue to frustrate NTEU's ability to provide counseling and representation to its members. The Orders and regulations have caused NTEU to expend staff-hours fighting against these actions; and the Defendants' actions continue to cause NTEU to expend time and resources educating its membership on the nature and scope of these *ultra vires* acts. The Defendants have thus impaired NTEU's core mission.

14.      Defendant Donald J. Trump, in his official capacity as President of the United States of America, issued the Policy/Career Executive Orders.

15.      The initial Policy/Career Order directed Defendant Scott Kupor, in his official capacity as OPM's Director, to approve or revise the lists of positions that

agencies designate to be transferred to the new schedule. The Order further directed Defendant Kupor to then promptly recommend to the President which positions should be shifted to the new schedule.

16.     The Order also directed the OPM Director to promptly rescind certain OPM regulations previously in effect entitled "Upholding Civil Service Protections and Merit System Principles" which were finalized and published on April 9, 2024 (89 Fed. Reg. 24982). The Order further directed the OPM Director to promulgate new regulations implementing the Policy/Career Order which he has done and which were published on February 6, 2026 (91 Fed. Reg. 5580).

**STATEMENT OF CLAIMS**

**I.      Congress's Creation of a Broad Competitive Service and a Narrow Excepted Service.**

17.     All employees in the executive branch of the federal government are in the competitive service, the excepted service, or the Senior Executive Service. 5 U.S.C. §§ 2102(a)(1), 2103(a); *see generally NTEU v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988).

18.     The present-day competitive civil service dates back more than 130 years to the Pendleton Civil Service Reform Act, which eliminated the spoils system and established a merit-based, competitive system for the appointment of federal employees. *See* 89 Fed. Reg. 24982 (Apr. 9, 2024) (summarizing the evolution of civil service reform laws).

19.     Thus, the "competitive service [is] the norm rather than the exception." *NTEU v. Horner*, 854 F.2d at 492. OPM has explained that "most government employees are in the competitive service." *See* 89 Fed. Reg. 24988.

20.     In enacting the Civil Service Reform Act (CSRA) of 1978, Congress enshrined certain merit system principles into law by mandating that, *inter alia*, federal service "selection and advancement should be determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition"; "[t]he Federal work force should be used efficiently and effectively"; and "[e]mployees should be protected against arbitrary action, personal favoritism or coercion for partisan political purposes." 5 U.S.C. § 2302(b)(1)-(8).

21.     Applicants for employment in the competitive service must go through a competitive hiring process (i.e., competitive examining). *See* OPM, Competitive Hiring, https://www.opm.gov/policy-data-oversight/hiring-information/competitive-hiring/; 5 C.F.R. Part 337.

22.     Applicants for excepted service positions are generally "excepted" from competitive service hiring requirements, such as taking a competitive examination. 5 C.F.R. § 6.1(a).

23.     There is a subset of excepted service employees "whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character" and whom "the President has excepted from the competitive service." 5 U.S.C. § 7511(b)(2).

24.     The CSRA's legislative history makes clear that "confidential, policy-determining, policy-making, or policy-advocating employees" means only noncareer, political appointees. *See* S. Rep. No. 95-969, at 48 (1978), reprinted in 1978 U.S.C.C.A.N. 2723, 2770 (describing confidential, policy employees as "appointments confirmed by the Senate").

25.     Merit Systems Protection Board (MSPB) precedent and related statutes reinforce this interpretation. *See O'Brien v. Office of Independent Counsel*, 74 M.S.P.R. 192, 206 (1997) (confidential, policy employees is "a shorthand way of describing positions to be filled by 'political appointees'") (citing *Special Counsel v. Peace Corps*, 31 M.S.P.R. 225, 231 (1986)); *see also* 5 U.S.C. § 9803(c)(2)(A) (defining "political appointee" as individuals in "confidential, policy-determining, policy-making or policy-advocating" positions); 5 U.S.C. § 349(d)(3)(B) (same); 5 U.S.C. § 725(c)(1) (same).

## II.     Congress Granted Most Federal Employees Due Process Protections.

26.     Most non-probationary employees in the competitive and excepted service have due process rights if an agency takes an "adverse action" against them. Congress has defined an "adverse action" as a removal, suspension for more than 14 days, a reduction in grade or pay, or a furlough of 30 days or less. 5 U.S.C. § 7512. Employees' due process rights include the right to notice of the proposed action, to respond, and to pursue appeals before the MSPB. 5 U.S.C. §§ 7511-13, 7701. Employees may appeal final MSPB decisions to federal court. *Id.* § 7703.

27.    The existence of these protections and rights is a critical part of the CSRA. For example, the Senate Committee report on that legislation stated that key players in the legislation thought of the "independent and strong Merit Board" as "'the cornerstone' of civil service reform." S. Rep. No. 95-969, at 7 (July 10, 1978).

28.    Non-probationary public employees have a constitutionally based property interest in continuing employment and such employment cannot be denied or stripped away without honoring due process rights, such as notice and an opportunity to respond. *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985). *See also Stone v. FDIC*, 179 F.3d 1368, 1374 (Fed. Cir. 1999) ("If the government gives a public employee assurances of continued employment or conditions dismissal only for specific reasons, the public employee has a property interest in continued employment.").

29.    "[T]he procedures required by 5 U.S.C. § 7513(b) [of the adverse action statute] reflect the requirements of constitutional due process." *Kriner v. Dep't of the Navy*, 61 M.S.P.R. 526, 531 (1994).

30.    In 1995 Congressional hearings, Chairman Jon. L. Mica stated that ". . . employees deserve due process. They should have the opportunity to tell their side of the  story to someone who will independently listen to them and be objective." *Streamlining Federal Appeals Procedures: Hearings Before the Subcomm. on Civil Service of the House Comm. on Government Reform and Oversight,* 104th Cong., 1st Sess. (Nov. 29, 1995).

31.     The portion of the CSRA providing due process rights excludes the subset of excepted service employees "whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character" and whom "the President has excepted from the competitive service." 5 U.S.C. § 7511(b)(2).

32.     Employees hired into positions that are not "confidential, policy-determining, policy-making or policy-advocating character" acquire vested rights in such positions once the employees are past their probationary or trial periods. These employees carry their due process rights with them even if their positions are later redesignated as confidential or policy related, and even if the employees are involuntarily moved from the competitive service, or from another excepted service schedule, into a new schedule. Because these rights are grounded in the Constitution, they cannot be stripped away by Presidential order or agency regulation.

## III.    Congress Granted Most Federal Employees Protection from Prohibited Personnel Practices.

33.     In addition, Congress has granted most employees statutory protection against "prohibited personnel practices" (PPPs). 5 U.S.C. § 2302. The statute bars agencies from taking certain personnel actions, such as disciplinary or corrective actions, against employees for prohibited reasons, such as whistleblowing reprisal or political coercion. *Id*. § 2302(a)(2)(A), 2302(b). Congress empowered the independent Office of Special Counsel to investigate PPP allegations. *Id*. §§ 1214, 1215.

9

34.     Statutory protection against prohibited personnel practices is not available to employees in positions that are "excepted from the competitive service because of [their] confidential, policy-determining, policy-making, or policy-advocating character" or positions "excluded from the coverage of this section by the President based on a determination by the President that it is necessary and warranted by conditions of good administration." 5 U.S.C. § 2302(a)(2)(B).

35.     Employees hired into positions that are not "confidential, policy-determining, policy-making or policy-advocating character" acquire vested rights in such positions once the employees are past their probationary or trial periods. These employees carry their rights to be protected against PPPs with them even if their positions are later redesignated as confidential or policy related, and even if the employees are involuntarily moved from the competitive service, or from another excepted service schedule, into a new schedule. Because these rights are grounded in the Constitution, they cannot be stripped away by Presidential order or agency regulation.

## IV.    The President's Executive Orders.

### A.    By statute, the President can create only narrowly defined excepted service schedules.

36.     The President may generally establish rules that govern federal employees in the competitive service. 5 U.S.C. § 3302.

37.     But Congress limited the President's authority to remove employees or positions from the competitive service. Congress authorized the President to make

"necessary exceptions of positions from the competitive service" only when warranted by "conditions of good administration." 5 U.S.C. § 3302.

38.    Before the Schedule F Executive Order, Presidents issued Executive Orders creating Schedules A, B, C, D and E, as necessary exceptions to the competitive service. 5 C.F.R. § 6.2. A Schedule G was created by Executive Order 14317 on July 17, 2025 (90 Fed. Reg. 34,753) (July 23, 2025).

39.    OPM has explained that Schedules A, B, C, D, and E were "designed to address unique hiring needs upon a determination that appointments through the competitive service was 'not practicable.'" *See* 89 Fed. Reg. 24,990 (Apr. 9, 2024).

### B.    The Schedule F Order was issued in 2020 and rescinded a few months later.

40.    President Trump issued the "Schedule F" Executive Order on October 20, 2020. Exec. Order No. 13957, 85 Fed. Reg. 67,631 (Oct. 20, 2020). This Order directed agencies to petition OPM to place positions of a "confidential, policy-determining, policy-making, or policy-advocating character" into a new excepted service Schedule F. If OPM granted the petition, such positions would be placed in the new schedule with the intent that such positions would lack statutory adverse action rights.

41.    The Schedule F Order, sec. 1, flatly stated that it was intended to enable agencies to avoid "the limitations imposed by competitive service procedures."

42.    The Schedule F Order, sec. 5(b), made clear that it applied to "currently existing positions" as well as to "newly created positions."

11

43.    OPM has stated that the Schedule F Executive Order "was designed to be broad and numerically unlimited." 89 Fed. Reg. 24,990.

44.    Agencies began implementing the Schedule F Order and broadly interpreted who it covered. For example, the Office of Management and Budget petitioned OPM in late 2020 and 2021 to include a *majority* of its workforce in Schedule F. GAO, *Civil Service-Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category for Federal Positions* (Sept. 2022), https://www.gao.gov/assets/gao-22-105504.pdf. *See* Erich Wagner, *OMB Reportedly Designated 88% of its Workforce for Schedule F*, Government Executive (Nov. 23, 2020, https://www.govexec.com/management/2020/11/omb-reportedly-designates-88-its-employees-schedule-f/170275/.

45.    NTEU learned through Freedom of Information Act requests submitted in 2022 and 2023 that OMB, when it petitioned OPM, included information technology specialists, human resources personnel, administrative assistants and employees at the GS-9 level as positions of a "confidential, policy-determining, policy-making, or policy-advocating character."

46.    President Biden rescinded President Trump's Schedule F Order on January 22, 2021. Exec. Order No. 14,003, 86 Fed. Reg. 7231 (Jan. 27, 2021).

12

C.    **In January 2025, President Trump issued the Policy/Career Order reinstating Schedule F.**

47.    President Trump issued the Policy/Career Order on January 20, 2025. Exec. Order No. 14,171, 90 Fed. Reg. 8625 (Jan. 31, 2025). That Order revoked President Biden's Executive Order 14,003; reinstated the original Schedule F Executive Order; and made additional changes to civil service procedures.

48.    As with Schedule F, the Policy/Career Order required agencies to petition OPM with lists of positions that the agencies believe are of a "confidential, policy-determining, policy-making, or policy-advocating character." The Policy/Career Order makes clear that employees in "'confidential, policy-determining, policy-making, or policy-advocating" positions include career, nonpolitical employees. Policy/Career Order, sec. 1.

49.    The Policy/Career Order, sec. 3(e), reinstated the Schedule F deadlines that required agencies to complete their initial review of positions within 90 days of the Order and finalize the petitions within 210 days. OPM has explained that "[a]gencies were given until April 20, 2025, to submit petitions identifying positions, and OPM has accepted additional petitions on a rolling basis." Memorandum from Scott Kupor, OPM, to Heads of Departments and Agencies at 2, February 5, 2026, https://www.opm.gov/chcoc/latest-memos/opm-schedule-policycareer-implementation-guidance-memorandum.pdf (OPM Memorandum).

50.    After receiving the agency petitions, the OPM Director is required by the Policy/Career Order, sec. 3(e)(iii), to then "promptly recommend to the President which positions should be placed in Schedule Policy/Career." Such positions would

13

be placed in the new Schedule Policy/Career upon the President issuing a new executive order. *Id.*; *see* OPM Memorandum at 2.

51.    The Policy/Career Order, sec. 2, stated that "such positions" in the new Schedule are exempted from the "adverse action procedures set forth in chapter 75 of title 5, United States Code."

52.    The Schedule F Order, which the Policy/Career Order reinstated, made clear that it was intended to facilitate firing more employees. The Order repeatedly discussed agency employers' alleged need to make conditions easier to terminate federal employees. It asserted, for example, that employees in positions that the Order covers should be exempted from adverse action protections because "removing poorly performing employees [can be] difficult." Policy/Career Order, sec. 2 (reinstating Schedule F Order, sec.1). The Order also stated that agencies "need the flexibility to expeditiously remove poorly performing employees from these positions without facing extensive delays or litigation." *Id.*

53.    The Administration made clear multiple times, through the Policy/Career Order, that  it wanted large numbers of federal employees terminated. President Trump stated, for example, on the same day he issued the Policy/Order, that "[m]ost of those bureaucrats are being fired—they're gone. It should be all of them." Erich Wagner, *Trump: Agencies Should Fire "All" Bureaucrats*, Government Executive (Jan. 20, 2025). And future Vice-President Vance advised President Trump to "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew

14

Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024).

54. The Schedule F Order, which the Policy/Career Order reinstated, directed agencies to establish their own rules to prohibit the personnel practices identified in 5 U.S.C. § 2302(b). Policy/Career Order, sec. 2 (reinstating Schedule F Order, sec. 6).

55. The Policy/Career Order also reinstated the Schedule F Order requirement that agencies must "expeditiously petition" the Federal Labor Relations Authority (FLRA) to determine if any positions in the Order's coverage should be excluded from a collective bargaining unit. Policy/Career Order, sec. 2 (reinstating Schedule F Order, sec. 5(e)).

### D.    The Implementing Schedule Policy/Career Order.

56. On June 3, 2026, President Trump's Implementing Policy/Career Order placed thousands of positions, affecting about 8000 employees (listed on a 229-page appendix), into Schedule Policy/Career. Exec. Order 14,410. Such placement was effective immediately. *Id.* sec. 5(b). The Order also directed agencies to notify affected employees within seven days. *Id.* sec. 5(c).

57. The Implementing Policy/Career Order's appendix includes attorneys, analysts and human resources specialists.

58. OPM has explained that "[e]mployees encumbering any such positions [on the appendix] become Schedule Policy/Career employees as of the date of the EO." Memorandum from Scott Kupor, OPM, to Heads of Departments and Agencies

(June 8, 2026), https://www.opm.gov/chcoc/latest-memos/opm-memo-re-executive-order-implementing-schedule-policycareer-in-the-excepted-service.pdf.

59.    The White House has stated the Schedule Policy/Career positions "are at-will positions." Fact Sheet: *President Donald J. Trump Increases Accountability in the Federal Workforce* (June 3, 2026), https://www.whitehouse.gov/fact-sheets/2026/06/fact-sheet-president-donald-j-trump-increases-accountability-in-the-federal-workforce/.

60.    OPM has issued a sample notice for agencies to use when reclassifying employees into Schedule Policy/Career which states that the employee's position is now "at-will" and prohibitions on prohibited personnel practices will no longer be enforced by the Office of Special Counsel. OPM, Templates: Notices to Applicants and Employees of Schedule Policy/Career, https://www.opm.gov/policy-data-oversight/hiring-information/hiring-authorities/schedule-policycareer/opm-templates-notices-to-applicants-and-employees-of-schedule-policycareer.pdf.

61.    The President can issue additional implementing executive orders affecting more positions and employees. OPM has stated that "positions may be converted to Schedule Policy/Career at a later date if the circumstances of the position warrant." OPM, Questions and Answers on Schedule Policy/Career Final Regulations – Updated June 8, 2026, https://www.opm.gov/policy-data-oversight/hiring-information/hiring-authorities/schedule-policycareer/opm-answers-to-frequently-asked-schedule-policycareer-questions.pdf it.

**E.    The Policy/Career Orders are unlawful in multiple respects.**

62.    Presidents may only except employees or positions from the competitive service if "necessary" and when warranted by "conditions of good administration." 5 U.S.C. § 3302.

63.    The Policy/Career Orders are not necessary nor warranted by good administration because there are existing statutory and regulatory procedures in place to address the alleged problems of poor performers or employees who fail to implement the Administration's policies.

64.    The Policy/Career Orders do not sufficiently explain why they are necessary, or why conditions of good administration warrant radical changes to Congress's adverse action or PPP procedures. The Policy/Career Order asserts unsupported generalities such as "[p]rinciples of good administration . . . necessitate action." Policy/Career Order, sec. 1.

65.    The Policy/Career Orders attempt to strip away vested due process from tenured employed hired into the competitive service, which is unlawful and contrary to congressional intent.

66.    The Policy/Career Orders attempt to strip away vested statutory protection from PPPs enjoyed by tenured employees hired into the competitive service, which is unlawful and contrary to congressional intent.

17

### V.    OPM Regulations Implementing the Policy/Career Order.

### A.    OPM rescinded its regulations and promulgated new ones implementing the Policy/Career Order.

67.    OPM promulgated regulations on April 9, 2024, that underscored that employees hired into the competitive service, once tenured, keep their due process rights if they are involuntarily moved into a new excepted service schedule for "confidential, policy-determining, policy-making, or policy-advocating" employees. 89 Fed. Reg. 24,982.

68.    Those 2024 regulations also made clear that the statutory term "confidential, policy-determining, policy-making, or policy-advocating" narrowly means only positions "exclusively associated with a *noncareer* political appointment." *See* 89 Fed. Reg. 24,983 (emphasis added).

69.    The Policy/Career Order, sec. 4, declared those 2024 regulations were "inoperative and without effect." The Order nevertheless directed OPM to promulgate new regulations that would rescind the 2024 regulations and implement the executive order. Consistent with the Order's directive, OPM proposed regulations on April 23, 2025. *See* 90 Fed. Reg. 17,182.

70.    During the public comment period on the proposed new regulations, OPM received more than 40,000 comments, with 94% opposed to the proposed rule. *See* 91 Fed. Reg. 5580-81 (summarizing comments received).

71.    NTEU submitted comments on May 21, 2025, opposing the proposed regulations and detailing why, if finalized, they would be contrary to law and bad policy.

18

72.    Despite such overwhelming opposition from commentors, OPM proceeded to issue its final regulations on February 6, 2026, with few changes from the proposed regulations. 91 Fed. Reg. 5580. The effective date was March 9, 2026. *Id.*

73.    OPM's new regulations stated that tenured employees in the competitive service whose positions are moved into Schedule Policy/Career will no longer have the statutory adverse actions appeal procedures to which they were previously entitled. *See* 91 Fed. Reg. 5628 (regulations would "remov[e] adverse action appeals"); OPM Memorandum at 3 ("Employees moved or appointed into Schedule Policy/Career positions are excepted from the procedures established under chapters 43 and 75 of title 5[.]").

74.    Under OPM's new regulations, tenured employees in the competitive service whose positions are moved into Schedule Policy/Career will no longer have the statutory protections from PPPs to which they were previously entitled. *See* 5 U.S.C. § 2302 (defining employees excluded from statutory protections); 91 Fed. Reg. 5639 (directing agencies to create a substitute PPP system); 91 Fed. Reg. 5647 (noting that the executive order requires "agencies to establish through internal agency policies protections for Schedule Policy/Career employees from PPPs").

75.    OPM's new regulations do not allow for PPP appeals to an independent Office of Special Counsel (as the statute does), nor do they require uniformity among agencies as to the specifics of any purported PPP protections. Agency-created

19

policies can be changed more easily than the statutory PPP protections that tenured employees currently have and which can only be changed by Congress.

76. OPM's new regulations say they are needed to facilitate the firing of poor performers or employees who resist implementing this Administration's policies. *See* 91 Fed. Reg. 5580 ("This [regulation] will allow agencies to quickly remove employees from critical positions . . . "); *id.* at 5591 ("Bureaucratic resistance is evident."); *id.* at 5593 ("Schedule Policy/ Career is needed to address" the "significant problem" of resistance).

77. OPM's initial estimate is that about 50,000 employees would have their positions shifted into Schedule Policy/Career. *See* 91 Fed. Reg. 5606. There are currently approximately 4,000 noncareer political appointees. The Policy/Career Order and OPM's regulations would thus expand these numbers more than tenfold.

78. OPM has stated that these employees "may meet" the criteria for being excluded from collective bargaining units. OPM Memorandum at 5.

**B.    OPM's Policy/Career regulations are unlawful for multiple reasons.**

79. OPM's regulations unlawfully define positions of a "confidential, policy-making, policy-advocating or policy-determining" character as encompassing career employees whose jobs are not characterized by a close working relationship to the President or agency heads.

80. OPM's regulations unlawfully attempt to strip away vested due process from tenured employed hired into the competitive service.

81.     OPM's regulations unlawfully attempt to strip away vested statutory protection from PPPs tenured employees hired into the competitive service have.

82.     OPM's regulations fail to explain why existing statutory and regulatory procedures do not work to address the alleged problem of poor performers or employees who "resist" Administration policy. *See* 91 Fed. Reg. 5581 (asserting that "removal restrictions too often . . . entrench bureaucratic policy-resistance" without explaining why). And the regulations fail to explain why reclassifying and then firing tens of thousands of employees as doing "confidential" or "policy" work is an appropriate or "necessary" solution to these alleged problems. They thus fail to make a rational connection between the alleged problem and the regulatory solution.

83.     Commentators explained to OPM that reclassifying tens of thousands of current employees and applicants for federal employment from positions which previously had statutory protections into "at-will" positions will hurt federal government recruitment and retention.

84.     OPM failed to adequately respond to these retention and recruitment points. OPM's answer relied in part on a study by James Sherk at the American First Policy Institute (91 Fed. Reg. 5593), but Mr. Sherk is the same administration official involved in the initial Schedule F. It is simply circular reasoning for an Administration to support its changes by citing to what one of its own officials has said.

21

85.     As another example of OPM's inadequate response, OPM noted commentators' concern that the rule would adversely impact recruitment or retention for scientific, technical, or cybersecurity positions. 91 Fed. Reg. 5642. OPM's first responded that commenters "are exaggerating the scope or impact of the proposed rule on the scientific, cybersecurity, and technical communities." *Id*. And then, paradoxically, OPM seems to concede that there *will* be a recruitment or retention problem which the OPM is going to avoid, rather than solve, by declaring that few such positions will be moved into the new Schedule. *See id*. ("OPM expects that, generally, relatively few of these line scientific, cybersecurity, or technical positions will be moved into Schedule Policy/Career"). If, as OPM apparently concedes, there may be recruitment and retention for some employees (doing technical or scientific work), then OPM should have addressed (but did not) why there will not be similar recruitment and retention problems for other employees.

86.     OPM also breezily states that even if there were recruitment and retention costs, "[t]he President has determined that these benefits outweigh the costs." 91 Fed. Reg. 5642. It is not a satisfactory response to comments to simply assert that the costs of a new rule do not matter.

## VI.     The Harm that NTEU Is Suffering and Will Suffer in the Future Due to the Executive Order.

87.     The Policy/Career Orders and the OPM regulations have already harmed NTEU by requiring it to spend time and resources counteracting the effects of the Orders and the implementing regulations.

22

88.    If not enjoined, the Policy/Career Orders and OPM's regulations will radically reshape the civil service by drastically increasing the number and type of employees who are in a new category of excepted service and at risk of dismissal or serious discipline without adverse action rights.

89.    The Policy/Career Orders and OPM's regulations apply to incumbent employees who have been hired into the competitive service or into previously existing excepted service categories. These incumbent employees accepted their jobs with the expectation that once a probationary or trial period passed, they would have the civil service and due process protections attendant to their appointment. The Orders and implementing regulations purport that employees moved to Schedule Policy/Career are stripped of those due process protections.

90.    The radical change that these Orders and the implementing regulations will effect has been widely recognized. The Schedule F Order, which the Policy/Career Order reinstates, was described "as a 'stunning' attempt to politicize the civil service and undermine more than a century of laws aimed at preventing corruption and cronyism in the federal government." Erich Wagner, "*Stunning" Executive Order Would Politicize Civil Service*, (Oct. 22, 2020), govexec.com, https://www.govexec.com/management/2020/10/stunning-executive-order-would-politicize-civil-service/169479/.

91.    It would have given the President "the power to mount a scorched-earth campaign" and gives him "largely unfettered authority to fire experts . . . while leaving behind a corps of embedded loyalists to undermine his successor."

Andrew Feinberg, *Trump Just Quietly Passed an Executive Order that Could Destroy a Future Biden Administration*, theindependent.co.uk (Oct. 23, 2020), https://www.independent.co.uk/voices/trump-executive-order-civil-service-biden-election-schedule-f-b1255692.html.

92.    It "would effectively upend the modern civil service, and put future presidents in the position of bringing in their own loyalists. . . ." Axios, *How Trump Could Reimpose "Schedule F" in 2025* (July 22, 2022), https://www.axios.com/2022/07/22/trump-presidency-schedule-f-federal-employees).

93.    The Administration admits that at least tens of thousands of competitive service employees will be moved into the Schedule Policy/Career. 91 Fed. Reg. 5606; *see* Natalie Andrews, *Trump Administration to Make It Easier to Fire 50,000 Federal Workers*, Wall Street Journal (Feb. 5, 2026), https://www.wsj.com/politics/policy/trump-federal-employees-new-category-1051bc29.

94.    NTEU's work to counteract the injury from the Policy/Career Orders and implementing regulations is diverting and will continue to divert NTEU staff from work it would otherwise be doing to represent employees, negotiate with agencies, and advocate to Congress on employees' behalf.

95.    NTEU represents thousands of federal employees who perform work relating to policy. Thus, many NTEU-represented employees are likely to be designated by their agencies as doing "policy-influencing" work and have their positions redesignated from the competitive service to Schedule Policy/Career.

24

Because of the Orders' and regulations' broad sweep, NTEU is expending scarce time and resources challenging agency efforts to include employees within the Orders' overbroad coverage. On behalf of these affected employees, NTEU must also combat the Orders' and regulations' purported stripping of NTEU members' accrued civil service and due process protections.

96. NTEU's legislative staff, for example, has assessed the Orders and regulations; evaluated whether there is legislative action that can be taken to address them; and communicated with Members of Congress and their staff about the Order's and regulations' likely impact on federal employees, particularly those in their districts. This has entailed and will continue to entail, *inter alia*, talking with congressional committee staff about appropriations proposals and other legislative action that would stop implementation of the initial Policy/Career Order and subsequent Orders and their regulations. NTEU staff must provide legislative language and consult with Members of Congress on the variations of language of any legislation.

97. NTEU's Legislative Department has also been reaching out to congressional staff to build support for that proposed legislative language, including communicating with staff on appropriations, authorizing and oversight committees; congressional leadership; offices of members of Congress whose states and districts contain large numbers of federal employees; and other interested members of Congress. In addition to these direct actions, NTEU's Legislative Department has

responded to inquiries from Hill staff regarding the impact of the Orders and regulations on NTEU-represented members.

98.     Staff in NTEU's Office of Field Operations have assessed the Orders and regulations to evaluate which NTEU bargaining unit employees might perform work falling within the Order's and regulations' wide scope and how best to protect these employees' due process rights. Given the extraordinarily broad definition of "policy-related work" contained within the Order and regulations, and the thousands of positions listed on the Implementing Policy/Career Order's appendix, Field Operations will continue to spend significant time and resources on this task. This includes contacting local chapter leaders to discuss with them individual member duties and reviewing employee position descriptions. NTEU must perform this evaluation to fulfill its statutory obligation to represent its bargaining unit employees, given the Orders' mandate to agencies to identify all positions to be converted to the Schedule Policy/Career.

99.     NTEU's Field Operations staff has also evaluated how it will respond when agencies act on the President's directive to "expeditiously petition" the FLRA to determine if any employees in the Schedule Policy/Career should be excluded from a collective bargaining unit. Such determinations must be made on the basis of an individual employee's assigned duties, not the employee's position description. Each such proceeding will be a fact-intensive proceeding that will explore the duties of each position. These proceedings may involve written argument or oral testimony

26

or both. The Order's command to send numerous petitions to the FLRA will result in a substantial expenditure of NTEU time and resources.

100.    Finally, as noted, NTEU represents federal employees in thirty-eight departments and agencies across the federal government. NTEU has litigated key issues concerning the civil service, including litigating the First Amendment, due process, and the rights of federal civil servants. As experts in this field, it will be the Union where members, the media and the public turn for help in understanding the broad scope of the Orders and their regulations. NTEU has been, and will continue to be, called on to explain the nuances of the Orders and regulations, and their adverse effects on the federal civil service. As part of that effort, NTEU's Communications and Public Relations Department has drafted press releases, distributed member-focused messages, and created online educational resources.

101.    NTEU represents employees whose positions are listed on the appendix to the implementing Policy/Career Order and who have been moved into Schedule Policy/Career.

102.    These employees have received notifications from their agencies that their positions have been reclassified.

103.    NTEU staff is counseling these employees and will continue to spend time and resources advising them on their rights and how their positions and jobs will be affected by this reclassification.

## CAUSES OF ACTION

**Count 1:   The President's Policy/Career Orders are unlawful and *ultra vires* because they exceed statutory authority and are contrary to congressional intent.**

104.   The paragraphs above are incorporated and reasserted as if fully set forth herein.

105.   Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

107.   Congress gave the President limited authority to prescribe rules for the competitive service but expressly cabined that authority by stating that any exceptions from the competitive service must be "necessary" and "as nearly as conditions of good administration warrant." 5 U.S.C. § 3302.

108.   The initial Policy/Career Order and the Implementing Policy/Career Order are neither necessary nor warranted by conditions of good administration as required by 5 U.S.C. § 3302.

109.   Reclassifying large numbers of employees in the competitive service or existing excepted service schedules into a new excepted service schedule with the intent of making them at-will employees is contrary to Congress's intent in establishing broad protections for most federal employees in the CSRA.

110.   Under civil service law, a "confidential, policy-making, policy-advocating or policy-determining" position is a non-career, political appointment characterized by a close working relationship to the President or agency heads.

28

111.   In a sharp and unprecedented departure from how prior administrations have interpreted the terms "confidential, policy-making, policy-advocating or policy-determining," the Policy/Career Orders cover "career" employees who "are not normally subject to change as a result of a Presidential transition," and thus is contrary to law.

**Count 2: The President's Policy/Career Orders are unlawful and *ultra vires* because they seek to deprive federal employees of accrued and vested rights.**

112.   The paragraphs above are incorporated and reasserted as if fully set forth herein.

113.   Non-probationary federal employees in the competitive service and most existing excepted service schedules acquire procedural due process rights and civil service protections grounded in the U.S. Constitution and civil service statutes.

114.   The initial Policy/Career Order and the implementing Policy/Career Order seek to move employees hired into the competitive service or existing excepted service schedules involuntarily into a new excepted service schedule where they would be stripped of their accrued due process rights, which is contrary to law. They are thus unlawful and ultra vires.

115.   Most non-probationary federal employees in the competitive service and most existing excepted service schedules acquire statutory protection against prohibited personnel practices. *See* 5 U.S.C. § 2302.

116.   Under the initial Policy/Career Order and the implementing Policy/Career Order, employees hired into positions that are in the competitive

29

service or existing excepted service schedules will be involuntarily transferred into a new excepted service schedule where they would be stripped of their accrued, vested statutory protection against prohibited personnel practices, which is contrary to the Constitution, the law. The Orders are thus unlawful and *ultra vires*.

**Count 3: OPM's regulations are unlawful and contrary to the APA because they purport to apply to employees other than noncareer, political appointees.**

117. The paragraphs above are incorporated and reasserted as if fully set forth herein.

118. The APA bars agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A), (B).

119. Under civil service law, a "confidential, policy-making, policy-advocating or policy-determining" position is a non-career, political appointment characterized by a close working relationship to the President or agency heads.

120. In a sharp and unprecedented departure from how prior administrations have interpreted the terms "confidential, policy-making, policy-advocating or policy-determining," OPM's regulations cover "career" employees who "are not normally subject to change as a result of a Presidential transition." This is unlawful and violates the APA.

**Count 4: OPM's regulations violate the APA because they seek to deprive federal employees of accrued and vested rights and thus are contrary to the Constitution and the law.**

121. The paragraphs above are incorporated and reasserted as if fully set forth herein.

122. The APA bars agency actions that are "not in accordance with law" or are "contrary to constitutional right." 5 U.S.C. § 706(2)(A), (B).

123. Non-probationary federal employees in the competitive service and most existing excepted service schedules acquire procedural due process rights and civil service protections grounded in the U.S. Constitution, Fifth and Fourteenth Amendments, and civil service statutes. Those rights include notice of proposed adverse actions and an opportunity to respond to such notices before termination or serious discipline.

124. Most non-probationary federal employees in the competitive service and most existing excepted service schedules acquire statutory protection against prohibited personnel practices. *See* 5 U.S.C. § 2302.

125. OPM's regulations establish a process for employees hired into positions that are in the competitive service or existing excepted service schedules to be involuntarily transferred into a new excepted service schedule where they would be stripped of their accrued due process rights and their accrued, vested protection against prohibited personnel practices, which is contrary to law, the Constitution, and congressional intent. The regulations thus violate the APA.

**Count 5: OPM's regulations violate the APA because they fail to explain why existing procedures are inadequate to address poor performers or employees who resist the Administration's policies, and fail to analyze the regulations' impact on federal government recruitment and retention. They are thus arbitrary and capricious.**

126. The paragraphs above are incorporated and reasserted as if fully set forth herein.

31

127.    OPM's regulations fail to explain why existing statutory and regulatory procedures do not address the problems cited in the regulation regarding of poor performers or employees who "resist" Administration policy. Nor do the regulations explain why reclassifying tens of thousands of employees as doing "confidential" or "policy" work is the best solution to these alleged problems.

108.    OPM failed to adequately respond to commentators' concerns, including that the regulations will adversely impact federal government retention and recruitment of employees.

109.    The APA requires agencies to make a rational connection between the facts found and the choice made in the final regulations, and requires agencies to provide a reasoned response to comments. OPM's regulations do not satisfy these requirements, and accordingly violate the APA.

## REQUEST FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff NTEU requests judgment against the Defendants:

A.    Declaring that the Policy/Career Orders are unlawful.

B.    Enjoining Defendant Kupor from implementing or enforcing the Policy/Career Orders.

C.    Declaring that OPM's regulations implementing the Policy/Career Orders are unlawful.

D.    Enjoining Defendant Kupor from implementing or enforcing the Policy/Career Order or OPM's regulations implementing that Order.

E.      Ordering Defendant Kupor to direct agencies to reclassify any positions that have been moved into Schedule Policy/Career back to their original competitive service or excepted service classification and restore the rights of any employees moved into Schedule Policy/Career.

F.      Awarding Plaintiff reasonable attorney fees and costs incurred.

G.      Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Paras N. Shah*
PARAS N. SHAH
General Counsel
D.C. Bar 983881

*/s/ Allison C. Giles*
ALLISON C. GILES
Associate General Counsel
D.C. Bar 439705

/s/ *Kathryn Bailey*
KATHRYN BAILEY
Assistant Counsel
D.C. Bar 1643256

/s/ *Noah Brozinsky*
NOAH BROZINSKY
Assistant Counsel
D.C. Bar 1655789
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
paras.shah@nteu.org
allie.giles@nteu.org
kathryn.bailey@nteu.org
noah.brozinsky@nteu.org

June 17, 2026          Attorneys for Plaintiff NTEU

33