**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL TREASURY EMPLOYEES UNION,

*Plaintiff*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*,

*Defendants*.

Civil Action No. 1:25-cv-170-JMC

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **3**

**I. STATUTORY FRAMEWORK** .......... **3**

A. The Competitive and Excepted Service .......... 3

B. The President and OPM's Authority over the Federal Workforce .......... 4

C. The Administrative Scheme .......... 5

D. The Statutory Basis for Policy/Career Designations .......... 7

**II. FACTUAL AND PROCEDURAL BACKGROUND** .......... **8**

A. The Prior Executive Order and Regulations .......... 8

B. The 2025 Policy/Career Order and OPM Guidance .......... 10

C. The 2026 Policy/Career Proposed Rule and Final Rule .......... 11

D. The 2026 Schedule Policy/ Career Executive Order .......... 13

E. This Lawsuit .......... 13

**ARGUMENT** .......... **13**

**III. PLAINTIFF HAS NOT DEMONSTRATED ARTICLE III STANDING** .......... **14**

**IV. PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE CIVIL SERVICE REFORM ACT** .......... **18**

A. Congress intended to preclude district court jurisdiction. .......... 19

B. These claims are the type Congress intended to be reviewed through the CSRA's administrative scheme. .......... 21

C. Plaintiff's claims are precluded under *Thunder Basin* and its progeny......................27

**V. ALL CLAIMS AGAINST THE PRESIDENT, AND ALL CLAIMS RELATING TO THE PRESIDENT'S EXERCISE OF HIS STATUTORY DISCRETION, SHOULD BE DISMISSED. ..........................................................................................................30**

A. None of the relief that Plaintiff seeks is available against the President, so he should be dismissed as a Defendant in this case.........................................................31

B. The President's exercise of his own statutory discretion is not reviewable...............33

C. Plaintiff cannot evade these limitations by bringing an ultra vires claim. .................35

**CONCLUSION ..................................................................................................................36**

# TABLE OF AUTHORITIES

## Cases

*Abney v. United States*,
431 U.S. 651 (1977) .......... 26

*AFGE v. Sec'y of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) .......... 20, 21, 25, 29

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
No. 25-cv-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) .......... 27

*Am. Fed'n of Gov't Emps, AFL-CIO v. Kupor*, Civ. A.,
No. 25-13305-GAO, 2026 WL 2676621 (D. Mass. Sep. 11, 2026) .......... 29

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*,
770 F. Supp. 3d 1215 (N.D. Cal. 2025) .......... 28

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*,
771 F. Supp. 3d 1127 (N.D. Cal. 2025) .......... 28, 29

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) .......... *passim*

*Am. Foreign Serv. Ass'n v. Trump*,
768 F. Supp. 3d 6 (D.D.C. 2025) .......... 28

*Am. Life League, Inc. v. Reno*,
47 F.3d 642 (4th Cir. 1995) .......... 19

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
801 F. Supp. 2d 383 (D. Md. 2011) .......... 35

*Anselmo v. King*,
902 F. Supp. 273 (D.D.C. 1995) .......... 6

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) .......... 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................ 32

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ........................................ *passim*

*Block v. Comty. Nutrition Inst.*,
467 U.S. 340 (1984) ........................................ 20, 24

*Cause of Action Inst. v. IRS*,
390 F. Supp. 3d 84 (D.D.C. 2019) ........................................ 18

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ........................................ 35, 36

*Citizens for Resp. & Ethics in Wash. v. U.S. Off. of Special Couns.*,
480 F. Supp. 3d 118 (D.D.C. 2020) ........................................ 15

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025) ........................................ 18

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................ *passim*

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
85 F. Supp. 3d 250 (D.D.C. 2015) ........................................ 18

*Desai v. U.S. Citizenship & Immigr. Servs.*, Civ. A.,
No. 20-1005 (CKK), 2021 WL 1110737 (D.D.C. Mar. 22, 2021) ........................................ 13

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ........................................ 35

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ........................................ 33

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ........................................ *passim*

*Env't Working Grp. v. U.S. FDA*,
301 F. Supp. 3d 165 (D.D.C. 2018) ........................................ 18

*Farm Sanctuary v. USDA*,
No. 24-382-cv, 2026 WL 1030616 (2d Cir. Apr. 16, 2026) ............................................16, 17

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ...............................................................................................*passim*

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ..........................................................................................35

*Fed. L. Enf't Officers Ass'n v. Ahuja*,
62 F.4th 551 (D.C. Cir. 2023) ..................................................................................23, 25, 30

*Filebark v. U.S. Dep't of Transp.*,
555 F.3d 1009 (D.C. Cir. 2009) ...............................................................................21, 22, 29

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ...........................................................................................25

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .....................................................................................................31, 32

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .........................................................................................33, 36

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) .......................................................................................20, 29

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) ...........................................................................................36

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ..........................................................................................................32

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .....................................................................................................14, 15

*Heckler v. Ringer*,
466 U.S. 602 (1984) ..........................................................................................................25

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025)..................................................32

*Jarkesy v. SEC*,
803 F.3d 9 (D.C. Cir. 2015) .......... 19

*Jerome Stevens Pharms., Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) .......... 18

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 31

*Lyons v. VA*,
273 F. App'x 929 (Fed. Cir. 2008) .......... 23

*Marshall v. HHS*,
587 F.3d 1310 (Fed. Cir. 2009) .......... 23

*Maryland v. USDA*,
151 F.4th 197 (4th Cir. 2025) .......... 29

*Maryland v. USDA*,
777 F. Supp. 3d 432 (D. Md. 2025) .......... 28, 29

*Maryland v. USDA*,
Nos. 12-1248, 12-1338, 2025 WL 1073657 (4th Cir. Apr. 7, 2025) .......... 29

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) .......... 32, 33

*N.Y. Republican State Comm. v. SEC*,
799 F.3d 1126 (D.C. Cir. 2015) .......... 19

*Nat'l Treasury Emps. Union v. Helfer*,
53 F.3d 1289 (D.C. Cir. 1995) .......... 3

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) .......... 33

*Nat'l Treasury Emps. Union v. Trump*,
770 F. Supp. 3d 1 (D.D.C. 2025) .......... 27

*New York v. Trump*,
181 F.4th 132 (D.C. Cir. 2026) .......... 25, 26, 27

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .......... 32

*Nohria v. Renaud*,
Civ. A. No. 20-cv-2085, 2021 WL 950511 n.3 (D.D.C. Mar. 14, 2021) .......... 13

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 35, 36

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .......... 35

*OPM v. Am. Fed'n of Gov't Emps.*,
145 S. Ct. 1914 (2025) .......... 28

*Padilla v. Mnuchin*,
Civ. A. No. 18-cv-02302, 2020 WL 1852431 (D. Colo. Apr. 13, 2020) .......... 6

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) .......... 15

*Sackett v. EPA*,
566 U.S. 120 (2012) .......... 24

*Seila Law LLC v. CFPB.*,
591 U.S. 197 (2020) .......... 4

*Smart Approaches to Marijuana v. Kennedy*,
835 F. Supp. 3d 37 (D.D.C. 2026) .......... 17

*Stanley v. DOJ*,
423 F.3d 1271 (Fed. Cir. 2005) .......... 24

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) .......... 32

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 19, 30

*Trump v. Cook*,
609 U.S. 528 (2026) .......... 31

*Tulare Cnty. v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) ....................................................................................35

*U.S. ex rel. McLennan v. Wilbur*,
283 U.S. 414 (1931) ........................................................................................................33

*United States v. Fausto*,
484 U.S. 439 (1988) ..........................................................................................20, 21, 30

*United States v. Texas*,
173 F.4th 659 (5th Cir. 2026).........................................................................................16

*Wilbur v. U.S. ex rel. Kadrie*,
281 U.S. 206 (1930) ........................................................................................................33

**Statutes**

5 U.S.C. § 704..................................................................................................................30

5 U.S.C. § 706..................................................................................................................22

5 U.S.C. § 1103..................................................................................................................4

5 U.S.C. § 1104..................................................................................................................5

5 U.S.C. § 1201..................................................................................................................6

5 U.S.C. § 1202..................................................................................................................6

5 U.S.C. § 1204.........................................................................................................*passim*

5 U.S.C. § 1211..................................................................................................................5

5 U.S.C. § 1212..................................................................................................................5

5 U.S.C. § 1214..................................................................................................................5

5 U.S.C. § 1301..................................................................................................................5

5 U.S.C. § 1302..................................................................................................................9

5 U.S.C. § 2102 .......... 3

5 U.S.C. § 2301 .......... 4

5 U.S.C. § 2302 .......... 3, 4

5 U.S.C. § 2951 .......... 4

5 U.S.C. § 3132 .......... 4

5 U.S.C. § 3302 .......... *passim*

5 U.S.C. § 3304 .......... 3, 4

5 U.S.C. § 3321 .......... 4

5 U.S.C. § 5107 .......... 5

5 U.S.C. § 5112 .......... 5

5 U.S.C. § 5405 .......... 5

5 U.S.C. § 7105 .......... 20

5 U.S.C. § 7123 .......... 20

5 U.S.C. § 7301 .......... 4

5 U.S.C. § 7511 .......... *passim*

5 U.S.C. § 7512 .......... 6, 7

5 U.S.C. § 7513 .......... 7

5 U.S.C. § 7514 .......... 7

5 U.S.C. § 7703(b) .......... *passim*

28 U.S.C. § 1295(a)(9) .......... 6

28 U.S.C. § 1331 ..... 19

**Rules**

Federal Rule of Civil Procedure 12(b)(1). ..... 2, 31, 36

Federal Rule of Civil Procedure 12(b)(6). ..... 31, 36

Local Civil Rule 7(n). ..... 13

**Regulations**

5 C.F.R. part 210 ..... 12

5 C.F.R. part 212 ..... 12

5 C.F.R. part 213 ..... 11

5 C.F.R. part 302 ..... 10, 12

5 C.F.R. part 1200 ..... 6

5 C.F.R. § 210.102 ..... 9, 10

5 C.F.R. § 213.101 ..... 11, 12

5 C.F.R. § 213.3601 ..... 12

5 C.F.R. § 1200.3 ..... 6

5 C.F.R. § 1201.34 ..... 6

**Other Authorities**

*Creating Schedule F in the Excepted Service*,
Exec. Order No. 13,957, 85 Fed. Reg. 67,631 (Oct. 21, 2020). ..... 8

*Excepting Administrative Law Judges from the Competitive Service*,
Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 10, 2018) ..... 7

Jon Shimabukuro & Jennifer Staman,
*Congressional Research Service, Categories of Federal Service Employment: A Snapshot*, 4 (2019) ........ 3

*Implementing Schedule Policy/Career in the Excepted Service*,
Exec. Order No. 14,410, 91 Fed. Reg. 34,893 (June 3, 2026) ........ 1, 13, 34

*Improving Performance, Accountability and Responsiveness in the Civil Service*
91 Fed. Reg. 5580 (Feb. 6, 2026) ........ 12

*Improving Performance, Accountability and Responsiveness in the Civil Service*,
90 Fed. Reg. 17,182 (Apr. 23, 2025) ........ 11, 12

OPM, *Guidance on Implementing President Trump's Executive Order titled "Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce,"* (Jan. 27, 2025) ........ 10, 11

*Organization and Procedures*,
89 Fed. Reg. 72,957 (Sep. 9, 2024) ........ 6

*Protecting the Federal Workforce*,
Exec. Order No. 14,003, 86 Fed. Reg. 7231 (Jan. 22, 2021) ........ 8

*Recruiting and Hiring Students and Recent Graduates*,
Exec. Order No. 13,562, 75 Fed. Reg. 82,585 (Dec. 27, 2010) ........ 7

*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*,
Exec. Order No. 14,171, 90 Fed. Reg. 8625 (Jan. 20, 2025) ........ 10

*Upholding Civil Service Protections and Merit System Principles*,
88 Fed. Reg. 63,862 (Sep. 18, 2023) ........ 8

*Upholding Civil Service Protections and Merit System Principles*,
89 Fed. Reg. 24,982 (Apr. 9, 2024) ........ 8, 9

**INTRODUCTION**

This case challenges the President's exercise of discretionary authority, explicitly authorized by Congress, over the President's own subordinates. The Pendleton Civil Service Act of 1883 ("Pendleton Act") created the classified civil service by providing for "competitive examinations for testing the fitness of applicants," while allowing "any necessary exceptions" to those competitive standards. *See* 22 Stat. 403, § 2. The Pendleton Act was later amended in 1966 to expressly authorize the President to provide for "necessary exceptions of positions from the competitive service." 5 U.S.C. § 3302(1); Government Organization and Employees, Pub. L. No. 89-554, §§ 3302, 80 Stat. 378, 417–18 (1966). Congress further provided that certain civil-service protections "do[] not apply to an employee . . . whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by . . . the President for a position that the President has excepted from the competitive service." 5 U.S.C. § 7511(b)(2)(A).

In Executive Order 14,410, the President exercised this explicit statutory authority to designate roughly 8,000 federal employees, out of millions of federal employees, as occupying positions of "a confidential, policy-determining, policy-making or policy-advocating character." *Id.* § 7511(b)(2). In the President's judgment, that relatively small class of employees in "[s]enior policy-influencing positions" "play particularly important roles" in assisting the President in fulfilling his constitutional duties. *Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14,410, § 1, 91 Fed. Reg. 34,893 (June 3, 2026). Although those positions will continue to "be filled based on merit and not political affiliation," the President determined that "ensuring that such employees can be removed for misconduct or poor performance is essential to protecting democratic self-government by an elected President," *id.*, and thus were appropriately designated as excepted from the competitive service under 5 U.S.C. §§ 3302(1) and 7511(b)(2)(A). Accordingly, neither the President nor his subordinates at the Office of the Personnel Management ("OPM") who have assisted him in implementing these directives have violated any provision of federal law.

Regardless, the Court need not—and should not—reach the merits here, because the Court lacks subject-matter jurisdiction for three independent reasons.

*First*, Plaintiff has not carried its burden to show Article III standing. Although Plaintiff's filings purport to vindicate the rights of federal employees—the overwhelming majority of whom are not affected in any way by the actions challenged here—*no* federal employee is a party to this case. Instead, the Plaintiff is a union—which filed this suit only on behalf of itself, rather than its members—and cannot identify *any* concrete and cognizable Article III injury.

*Second*, Plaintiff's suit is foreclosed by the comprehensive remedial scheme set forth in the Civil Service Reform Act of 1978 ("CSRA"). The CSRA precludes federal district court jurisdiction over suits like this one—focused on Executive Branch employment policies and guidance—and instead channels those challenges into a dedicated and reticulated administrative scheme. That administrative scheme ultimately allows for judicial review in an Article III court, if necessary—the U.S. Court of Appeals for the Federal Circuit. But Plaintiff cannot sidestep Congress's choices to channel review outside of federal district court.

*Third*, this suit does *not* present the more typical fact pattern of an attempt to seek review of agency action taken by the President's subordinates, exercising their own statutory authority. Instead, this suit directly challenges *the President's* exercise of *the President's* own direct and discretionary statutory authority. That distinction matters for purposes of judicial review: "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 477 (1994). This principle requires dismissal of all claims relating to the President's exercise of discretionary statutory authority—in particular, all claims (and all requests for relief) relating to the President's issuance of Executive Order 14,410 to identify positions to place into the new Schedule Policy/Career.

As Plaintiff has not carried its burden to establish subject-matter jurisdiction, Defendants move to dismiss this case, in its entirety, under Federal Rule of Civil Procedure 12(b)(1).

## BACKGROUND

## I. STATUTORY FRAMEWORK

### A. The Competitive and Excepted Service

Subject to various exceptions, "civil service employees in the executive branch of the federal government, other than those in the Senior Executive Service, are either in the 'competitive service' or the 'excepted service.'" *Nat'l Treasury Emps. Union v. Helfer*, 53 F.3d 1289, 1290 (D.C. Cir. 1995) ("*NTEU*"); *see* 5 U.S.C. § 2102. Most federal employees are in the competitive service, but roughly one third are in the excepted service. *See* Jon Shimabukuro & Jennifer Staman, Cong. Rsch. Serv., R45635, Categories of Federal Civil Service Employment: A Snapshot 4 (2019).[1] The "competitive service" consists of "all civil service positions in the executive branch, except" "positions which are specifically excepted from the competitive service by or under statute," certain political appointees, and "positions in the Senior Executive Service." 5 U.S.C. § 2102(a).

Positions in the competitive service are subject to specific provisions for hiring and removal not applicable to the excepted service. *See, e.g.*, *id.* § 3304. While federal employees generally are entitled to many substantive and procedural protections related to their employment, *e.g., id.* § 2302(a)(2)(B), those restrictions and procedural protections do not apply to the same extent to all those in the excepted service, *compare id.* § 7511(a)(1)(A) ("employee" entitled to certain rights includes individual in competitive service with one year of continuous service), *with id.* § 7511(a)(1)(C) ("employee" entitled to those same rights includes individual in excepted service with two years of continuous service).

As relevant here, certain otherwise-required procedures for taking adverse personnel actions do not apply where a position is "determined to be of a confidential, policy-determining, policy-making or policy-advocating character" by "the President," by "the Office of Personnel Management," or by "the head of an agency." *Id.* § 7511(b)(2).

[1]Available at https://fas.org/sgp/crs/misc/R45635.pdf (last visited Oct. 7, 2026).

### B. The President and OPM's Authority over the Federal Workforce

Article II of the U.S. Constitution vests the entire executive power in the President. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). In addition, Congress has, by statute, provided for substantial presidential authority over the federal workforce. Indeed, numerous statutory provisions provide that "[t]he President may prescribe rules governing" a variety of Executive Branch personnel issues, including exceptions from the competitive service. 5 U.S.C § 3302; *see, e.g.*, *id.* § 2301 (administering applicability of the merit system principles), *id.* § 2302 (excepting positions from prohibited personnel practice requirements), *id.* § 2951 (directing reports from appointing authorities), *id.* § 3132 (providing applicability of and exclusions for the Senior Executive Service), *id.* § 3301 (developing rules for admission into the civil service), *id.* § 3304 (creating competitive examination procedures), *id.* § 3321 (designing probationary status directions), *id.* § 7301 ("prescrib[ing] regulations for the conduct of employees in the executive branch."), *id.* § 7511(b)(2) (designating positions to be of a confidential, policy-determining, policy-making or policy-advocating character). The breadth and depth of statutory authorization for direct Presidential action in this sphere cannot be overstated. Beginning with the Pendleton Act in 1883, and in repeated subsequent enactments, Congress has called upon the President to make rules and develop Executive Branch personnel policies at his discretion.

Congress also provided OPM with various responsibilities in this sphere. After all, the President could not manage the vast Executive Branch workforce on his own. Thus, the OPM Director is tasked with "executing, administering, and enforcing . . . the civil service rules and regulations of the President and the Office and the laws governing the civil service." *Id.* § 1103(a)(5)(A). The OPM Director is similarly tasked with "aiding the President, as the President may request, in preparing such civil service rules as the President prescribes, and otherwise advising the President on actions which may be taken to promote an efficient civil service and a systematic application of the merit system principles." *Id.* § 1103(a)(7). And for the competitive service specifically, "[t]he Office of Personnel Management shall aid the President, as he may request, in

preparing the rules he prescribes under this title for the administration of the competitive service." *Id.* § 1301.

OPM need not only assist as the President personally exercises his statutory powers. Rather, "the President may delegate, in whole or in part, authority for personnel management functions, including authority for competitive examinations, to the Director of the Office of Personnel Management." *Id.* § 1104(a)(1). And in certain instances, Congress provided OPM with its own authorities. *See, e.g.*, *id.* §§ 5107, 5112 (providing OPM with the authority to set standards for pay scales); *id.* § 5405 (allowing OPM to promulgate regulations governing the Human Capital Performance Fund).

**C. The Administrative Scheme**

Congress created the Office of Special Counsel ("OSC") to, among other things, protect employees, applicants for employment, and former employees from prohibited personnel practices. *See id.* §§ 1211–12. The Special Counsel may receive and investigate complaints of prohibited personnel practices and may petition the Merit Systems Protection Board ("MSPB") for a stay of personnel actions pending investigation, and based on the results of an investigation, seek corrective action. *See id.* § 1214(a)(1)(A), (b)(1)(A)(i), (b)(1)(D). At the request of the Special Counsel for a stay, any member of the MSPB must order such a stay unless the member determines that, under the facts and circumstances involved, such a stay would not be appropriate. *See id.* The MSPB may extend the period of any stay; if it lacks a quorum, any remaining member may, upon request by the Special Counsel, extend the period of any stay. *See id.* § 1214(b)(1)(B). If the MSPB determines that the Special Counsel has demonstrated that certain prohibited personnel practices have occurred, exist, or are to be taken, it may order appropriate corrective action. *See id.* § 1214(b)(4)(B). Any employee, former employee, or applicant for employment adversely affected by an order or decision of the MSPB may obtain judicial review of that order or decision, depending on the claims asserted, in the United States Court of Appeals for the Federal Circuit, another circuit court, or a district court. *See id.* §1214(c)(1); *see also id.* § 7703(b).

Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See id.* § 1204(a)(1). The MSPB's three members are appointed by the President and confirmed by the Senate to staggered seven-year terms. *See id.* §§ 1201, 1202(a). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *See id.* §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions, depending on the claims asserted, in the Federal Circuit, another circuit court, or a district court. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

MSPB regulations set forth at 5 C.F.R. part 1200: (i) allow employees to proceed as a class, *see id.* § 1201.27; *see also Anselmo v. King*, 902 F. Supp. 273, 275 n.1 (D.D.C. 1995) ("The MSPB has the power to certify a class."); (ii) allow persons or organizations who want to participate in a proceeding because they believe the proceeding, or its outcome, may affect their rights or duties to intervene, *see* 5 C.F.R. § 1201.34; and (iii) allow matters to be joined or consolidated, *see id.* § 1201.36. With limited exceptions, "[i]ntervenors have the same rights and duties as parties[.]" *Id.* § 1201.34(d). The regulations also allow participation of an amicus curiae. *See id.* § 1201.34(e). If there are fewer than three members of the MSPB, the Board may operate with two sitting members. *See Padilla v. Mnuchin*, Civ. A. No. 18-cv-02302, 2020 WL 1852431, at *7 (D. Colo. Apr. 13, 2020), *aff'd*, 836 F. App'x 674 (10th Cir. 2020). In addition, the MSPB promulgated a rule in 2024 that expanded the functions it can perform without a quorum or when there is deadlock between only two present Board members. *See Organization and Procedures*, 89 Fed. Reg. 72,957, 72,957–58 (Sep. 9, 2024) (codified at 5 C.F.R. § 1200.3). As a result, where two "Board members are unable to decide any case by majority vote, the decision, recommendation, or other order under review may be deemed the final decision or order of the Board." 5 C.F.R. § 1200.3(b). And where only one or no Board members are able to act, the lone Board member or the Clerk of the Board may direct various types of matters, such as settlement, to "an administrative judge or other official[.]" *Id.* § 1200.3(c)-(d).

### D. The Statutory Basis for Policy/Career Designations

As discussed, since the creation of the civil service in the 19th Century, the President has been directly vested with the ability to except positions from the competitive service. Section 3302 provides the "President may prescribe rules governing the competitive service" and that such rules "shall provide, as nearly as conditions of good administration warrant," for "necessary exceptions of positions from the competitive service." 5 U.S.C. § 3302(1). For decades, the Executive Branch has managed the federal civil service by creating such exceptions. *See, e.g.*, *Excepting Administrative Law Judges from the Competitive Service*, Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 10, 2018); *Recruiting and Hiring Students and Recent Graduates*, Exec. Order No. 13,562, 75 Fed. Reg. 82,585 (Dec. 27, 2010). These types of exceptions enable a nimbler federal workforce and make the Executive Branch more responsive to the will of the people.

In addition, Congress explicitly specified a particular type of position—one determined to be of a confidential, policy-determining, policy-making or policy-advocating character—as qualifying for exclusion. Congress directed that a "position [that] has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by" "the President," OPM, or the head of an agency, would be exempt from various procedures governing removal, certain suspensions, reductions in pay, and other related actions. 5 U.S.C. §§ 7511–14. Positions in this category, the subject of this suit, will be referred to as "policy-influencing positions."

All told, policy-influencing positions were recognized by Congress as requiring special attention and increased Presidential control—including exemptions from otherwise restrictive and time-consuming procedures where the agency wishes to remove such employees. This has ensured a broad space for Presidential rulemaking to designate such positions and a high degree of accountability for these particularly sensitive positions.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Prior Executive Order and Regulations

On October 21, 2020, President Trump invoked his authority under Sections 3301, 3302, and 7511 and created a new schedule "excepted from the competitive service" for "career positions in the Federal service of a confidential, policy-determining, policy-making, or policy-advocating character." *Creating Schedule F in the Excepted Service*, Exec. Order No. 13,957 §§ 1, 4, 85 Fed. Reg. 67,631 (Oct. 21, 2020). Under this Executive Order, each agency was ordered that it must submit to OPM the specific positions it proposed should be added to this new schedule. *Id.* § 5(a)(i). The Director of OPM was directed to review those submissions and determine which, if any, should in fact be excepted. *Id.* § 5(d).

Upon taking office, President Biden issued Executive Order 14,003 revoking the prior order and instructing agencies to "immediately suspend, revise, or rescind proposed actions, decisions, petitions, rules, regulations or other guidance pursuant to, or to effectuate, [the prior order]." *Protecting the Federal Workforce*, Exec. Order No. 14,003 § 2(b), 86 Fed. Reg. 7231 (Jan. 22, 2021). OPM then took additional action. In 2023, it issued a notice of proposed rulemaking titled "Upholding Civil Service Protections and Merit System Principles." 88 Fed. Reg. 63,862 (Sep. 18, 2023). It sought to implement, by rule: (1) retention by employees of adverse action protections when their positions are held to be policy-influencing; (2) a definition of "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy-determining" as covering only "noncareer, political appointments"; and (3) "specific additional procedures that apply when moving positions from the competitive service to the excepted service, or from one excepted service schedule to another," especially when such movements would affect adverse action coverage. *Id*. OPM later issued a final rule ("April 2024 Final Rule"). *Upholding Civil Service Protections and Merit System Principles*, 89 Fed. Reg. 24,982 (Apr. 9, 2024).

Several regulatory provisions brought into effect by the April 2024 Final Rule are relevant to this litigation. First, OPM implemented its proposed definitions for policy-influencing positions:

> *Confidential, policy-determining, policy-making, or policy-advocating* means of a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President and the Administration, and that carries no expectation of continued employment beyond the presidential administration during which the appointment occurred.
>
> *Confidential or policy determining* means of a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President and the Administration, and that carries no expectation of continued employment beyond the presidential administration during which the appointment occurred.

*Id.* at 25,045 (codified at 5 C.F.R. § 210.102(b)(3), (4)) (citing as statutory authority 5 U.S.C. §§ 1302, 3301, and 3302).

Next, OPM added "Subpart F" titled "Moving Employees and Positions into and Within the Excepted Service," to the relevant regulatory scheme. *Id.* at 25,030, 25,046–47. The new subpart established various procedural requirements that Executive Branch officials must follow before moving positions into a new excepted service schedule or moving individual employees with accrued civil service protections into a position without such protections. *See id.* Subpart F also provided certain appeal rights to the MSPB for employees whose positions were involuntarily moved into an excepted service schedule. *Id.* at 25,047. Specifically, it allowed appeals challenging a failure to follow certain requirements established in Subpart F, the voluntariness of moving to a new position in the excepted service, and the "eliminat[ion of] competitive status or any procedural and appeal rights that had previously accrued." *Id.*

The regulations also provided other protections for employees related to being moved to a different schedule. *See, e.g.*, *id.* at 25,046 (establishing that "[a]n employee who was in the competitive service and had competitive status" at the time of an involuntary move into the excepted service "remains in the competitive service for the purposes of status and any accrued adverse action protections").

**B. The 2025 Policy/Career Order and OPM Guidance**

When President Trump assumed office for a second time in January 2025, he issued a new executive order, the "Policy/Career Order," revoking President Biden's order and reinstating his earlier order with some modifications. The President established a new excepted service schedule for positions of a confidential, policy-determining, policy-making, or policy-advocating character—tracking the language used by Congress—that are not normally subject to change as a result of a Presidential transition. *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, Exec. Order No. 14,171 § 3, 90 Fed. Reg. 8625 (Jan. 20, 2025). The President directed that the OPM Director, in consultation with the Executive Office of the President, provide additional guidance to agencies about what positions might qualify, in addition to the President's own guidance. *Id.* § 5. The President established that agencies would recommend positions that may be suitable for the new schedule to OPM, and that OPM's Director would then decide what positions OPM would recommend to the President. *Id.* §§ 3(e), 5. Recognizing that 5 C.F.R. § 210.102(b)(3), (4) and 5 C.F.R. part 302, subpart F were issued with delegated Presidential authority, the President reasserted his statutory prerogative and rendered those regulations inoperative. *Id.* § 4. Lastly, the President affirmed that "[e]mployees in or applicants for Schedule Policy/Career positions are not required to personally or politically support the current President or the policies of the current administration." *Id.* § 3(f)(ii).

On January 27, 2025, OPM issued guidance pursuant to the President's directive. OPM, *Guidance on Implementing President Trump's Executive Order titled, "Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce"* (Jan. 27, 2025) ("January 2025 Memorandum").[2] For the most part, the January 2025 Memorandum consists of guidance on positions that may qualify for Schedule Policy/Career and the procedure for future agency recommendations. *Id.* at 1–5. OPM also explained to agencies that the President, through the Policy/Career Order, had rendered certain regulations inoperative and without effect. *Id.* at 5.

[2] Available at https://perma.cc/VD2S-D6CV.

Lastly, OPM explained that, as the Policy/Career Order requires, "agencies will be forbidden from making Schedule Policy/Career appointments based on political affiliation." *Id.* at 5–6. The appendix of the memorandum includes a consolidated version of the reinstated prior order as modified by the Policy/Career Order. *See id.*, Appendix 1 ("Consolidated Order").

### C. The 2026 Policy/Career Proposed Rule and Final Rule

On April 23, 2025, OPM published a proposed rule for implementing Schedule Policy/Career ("Proposed Rule"). *Improving Performance, Accountability and Responsiveness in the Civil Service*, 90 Fed. Reg. 17,182 (Apr. 23, 2025). The Proposed Rule addressed several factors that OPM believes received "inadequate consideration" when OPM promulgated the April 2024 Final Rule, including that (i) "adverse action procedures and appeals make it very challenging for agencies to effectively address poor performance or serious misconduct;" (ii) civil servants may not impartially implement an administration's policy, which can generate problematic policy resistance; and (iii) the limitation of "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy-determining" positions to exclusively noncareer political appointments is based on the misguided interpretation that these categories are terms of art. *See id.* at 17,189–98. To that end, the Proposed Rule proposed to amend the Excepted Service regulations in 5 C.F.R. part 213 to incorporate Schedule Policy/Career into OPM's civil service regulations. *Id.* at 17,200.

In particular, the Proposed Rule proposed amending 5 C.F.R. § 213.101 to include two new definitions for "career positions" and "noncareer positions" for purposes of part 213 to clarify the distinction between noncareer Schedule C positions and career Schedule Policy/Career positions. *Id.* OPM also proposed to remove the definitions of policy-influencing positions added by the April 2024 Final Rule because these "are not terms of art that refer to political appointments in Schedule C. Rather, they have their plain English meaning—confidential positions or those that determine, make, or advocate for policy." *Id.* at 17,202. The Proposed Rule also proposed eliminating certain procedural protections for employees whose positions were moved or who were involuntarily transferred into a policy-influencing excepted service position. *Id.* Next, the Proposed Rule proposed amendments to the procedures for moving positions into, or between

excepted service schedules. *Id.* at 17,204. Finally, the Proposed Rule also proposed retaining the competitive service hiring procedures for positions moved into Schedule Policy/Career. *Id.* at 17,207. After considering over 40,000 comments, OPM ultimately implemented the ideas laid out in the Proposed Rule when it promulgated the Final Rule implementing Schedule Policy/Career on February 6, 2026. *See Improving Performance, Accountability and Responsiveness in the Civil Service* ("Final Rule"), 91 Fed. Reg. 5580 (Feb. 6, 2026).

The Final Rule begins by adding definitions to 5 C.F.R. § 213.101 to clarify the distinction between noncareer Schedule C positions and career Schedule Policy/Career positions as contemplated by the Proposed Rule. *Id.* at 5608, 5653. The Final Rule then amends the regulations for the excepted service to state that the President may himself place positions into Schedule Policy/Career. *Id.* at 5608. The Final Rule also includes several provisions to include references to Schedule Policy/Career where applicable throughout. *See id.* at 5609. Next, the Final Rule amends the regulations for Schedule C appointments to align with the text of Civil Service Rule 6.2, as amended by Executive Order 13,957. *See id.* The Final Rule also added a new section at 5 C.F.R. § 213.3601 to create Schedule Policy/Career. *Id.* at 5610, 5654. The Final Rule then amends 5 C.F.R. part 210 (Basic Concept and Definitions) to remove the definitions for positions of a "confidential, policy-determining, policy-making, or policy-advocating" character and those that are "confidential or policy-determining," which had equated these phrases with political appointees. *Id.* at 5612. OPM then rescinded the changes in the April 2024 Final Rule that purported to allow employees whose positions were moved or who were involuntarily transferred into a position in the policy-influencing excepted service to remain covered by chapter 75 adverse action procedures and MSPB appeals. *Id.* Finally, OPM also (i) amended 5 C.F.R. parts 212 and 302 to modify the procedures for moving positions into or between excepted service schedules, *see id.* at 5614; and (ii) modified part 302 to clarify that appointments to Schedule Policy/Career positions will be made using the hiring procedures that would have otherwise been used had the position not been moved into the new schedule, *id.* at 5619.

### D. The 2026 Schedule Policy/Career Executive Order

On June 3, 2026, President Trump issued Executive Order 14,410, *Implementing Schedule Policy/Career in the Excepted Service*, 91 Fed. Reg. 34,893 (June 3, 2026). Executive Order 14,410 published a list of positions the President had determined were of a "confidential, policy-determining, policy-making, or policy-advocating character," and should therefore be placed in Schedule Policy/Career. *Id.* at 34,896–35,124 (Appendix to Exec. Order).

### E. This Lawsuit

On January 20, 2025, Plaintiff, a union for federal employees, filed this suit. ECF No. 1. On June 17, 2026, Plaintiff filed its Amended Complaint, ECF No. 30 ("Am. Comp."). Defendants now move to dismiss the Amended Complaint for lack of subject-matter jurisdiction.

## ARGUMENT

The Court lacks subject-matter jurisdiction over this matter for three independent reasons. *First*, Plaintiff has not carried its burden to demonstrate Article III standing. *Second*, Plaintiff's claims are precluded as Congress has channeled these employment claims into a comprehensive and reticulated administrative scheme with its own procedures and limitations on judicial review. *Third*, "judicial review of the President's decision is not available" for all claims against the President (and all claims relating to the President's exercise of his own statutory discretion). *Dalton*, 511 U.S. at 477 (1994).[3]

[3] Defendants should not be required to produce an administrative record in connection with this motion. As this Motion does not cite to or otherwise rely on the administrative record, Local Rule 7(n) should not apply at this juncture, and in any event, the Court should waive any applicable requirement under Rule 7(n) under these circumstances, as courts in this district routinely do when the administrative record is unnecessary to decide the motion. *See, e.g., Desai v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 20-1005 (CKK), 2021 WL 1110737, at *5 n.7 (D.D.C. Mar. 22, 2021) ("Consistent with other courts in this jurisdiction, the Court shall grant the Government's motion to waive compliance with Local Civil Rule 7(n)'s requirement that the agency submit an index of the administrative record."); *Nohria v. Renaud*, Civ. A. No. 20-cv-2085, 2021 WL 950511, at *4 n.3 (D.D.C. Mar. 14, 2021) ("[f]ollowing the practice of other courts in this jurisdiction" and "waiv[ing] compliance with Local Civil Rule 7(n) because 'the administrative record is not necessary for [the court's] decision'" (citations omitted)); *see also* LCvR 7(n)(1) (requiring an appendix for "those portions of the administrative record that are cited or otherwise relied upon").

## I. PLAINTIFF HAS NOT DEMONSTRATED ARTICLE III STANDING.

Although this suit purports to vindicate the rights of federal employees, no employee is a party. It was filed by a union, the National Treasury Employee Union ("NTEU"). And though NTEU may have policy objections to the actions challenged here, it has not suffered a concrete and cognizable Article III injury. Indeed, NTEU does not even attempt to establish standing as a membership association, but sues only "on behalf of itself" based primarily on the theory that Defendants have forced NTEU to "divert and drain its resources," "expend staff-hours fighting against these actions," and "expend time and resources educating its membership." Am. Compl. ¶¶ 12–13. None of those theories of injury establishes Article III standing.

Plaintiff "brings this action on behalf of itself" allegedly for harms that have impacted NTEU "directly." *Id.* ¶ 12. Generally, "organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *FDA v. All. for Hippocratic Med.,* 602 U.S. 367, 393 (2024) ("*Alliance*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals," *id.* at 393-94—that is, unlike under the rubric of associational standing, they cannot rely on alleged injuries to their members. In an effort to carry this burden, Plaintiff briefly identifies two categories of theories of injuries to the organization: (i) the alleged diversion of NTEU's resources to respond to the challenged actions, *see* Am. Compl. ¶¶ 13, 87, 94–103, and (ii) the alleged harm to its mission of protecting its members from arbitrary, capricious and other wrongful agency action, *id.* ¶ 13. Neither theory has merit.

**Diversion of Resources.** NTEU primarily relies on an explicit diversion-of-resources theory of organizational standing. To support this theory, NTEU alleges that it had to "divert and drain its resources to counteract" Defendants' actions, "expend" an unidentified amount of "staff-hours fighting against [Defendants'] actions," and "expend" an unidentified amount of "time and resources educating its membership on the nature and scope" of the actions. *Id.*; *see also id.* ¶ 87 ("The Policy/Career Orders and the OPM regulations have already harmed NTEU by requiring it to spend time and resources counteracting the effects of the Orders and the implementing

regulations."); *id.* ¶ 94 (claiming "NTEU'S work to counteract" the Policy/Career Orders and implementing regulations will "divert NTEU staff" from other work). Plaintiff further provides the bare allegation, without any further information, that Defendants' actions "frustrate NTEU's ability to provide counseling and representation to its membership." *Id.* ¶ 13. None of these allegations suffices to provide organizational standing.

As an initial matter, Plaintiff fails to provide any allegations concerning the magnitude of staff hours or other resources that Plaintiff allegedly "expend[ed]" in response to Defendants' actions. *See Id.* ¶¶ 13, 87, 94–103. Thus, even if this sort of diversion-of-resources theory were still permissible—which it is not, *see infra* at 15–17—Plaintiff's allegations would still be insufficient to show a legally cognizable Article III injury, as it is impossible to determine that the alleged actions were a meaningful "impair[ment]" of the organization's "ability to provide . . . services" in support of its mission. *Havens*, 455 U.S. at 379; *see also Citizens for Resp. & Ethics in Wash. v. U.S. Off. of Special Couns.*, 480 F. Supp. 3d 118, 127 (D.D.C. 2020) (explaining that for organizational standing an injury "must 'inhibit[]' the organization's 'daily operations' in a concrete way." (quoting *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015))).

Even more fundamentally, *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) forecloses Plaintiff's diversion-of-resources theory of organizational standing as a matter of law. In *Alliance*, the plaintiffs, medical associations and several individual doctors, challenged FDA actions making it easier for doctors to prescribe mifepristone. *Id.* at 376. Those plaintiffs did not themselves prescribe or use mifepristone, and FDA did not impose any relevant regulatory requirements on the plaintiffs. The *Alliance* Court observed that organizations may "sue on their own behalf for injuries *they* have sustained," *id.* at 393 (quoting *Havens*, 455 U.S. at 379 n.19) (emphasis added), but clarified that an organization cannot establish injury by asserting the rights of others: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

Most importantly, *Alliance* explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified the Supreme Court's prior decision in "*Havens* does not support such an expansive theory of standing." *Id.* at 395. Accordingly, after *Alliance*, a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

This foreclosed theory is indistinguishable from Plaintiff's theory of standing here. Plaintiff explicitly seeks to assert standing based on "staff-hours fighting against [Defendants'] actions," the "time and resources [NTEU spent] educating its membership on the nature and scope," and broadly the resources NTEU "divert[ed] . . . to counteract" Defendants' actions. Am. Compl. ¶¶ 13, 87, 94. These are virtually identical to the diversion-of-resources arguments the Supreme Court rejected in *Alliance*. *Compare id.* ¶¶ 13, 87, 94, *with Alliance*, 602 U.S. at 394 ("According to the medical associations, FDA has 'impaired' their 'ability to provide services and achieve their organizational missions' . . . That argument does not work to demonstrate standing." (citation omitted)). As recognized by many courts after *Alliance*, these types of arguments are now foreclosed, and thus cannot support NTEU's organizational standing here. *See e.g.*, *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 633 (9th Cir. 2026) (overruling prior circuit precedent allowing resource-diversion standing, explaining that "[i]t was not enough that the organizations in *Hippocratic Medicine* had diverted resources in response to the FDA's actions"); *United States v. Texas*, 173 F.4th 659, 665 (5th Cir. 2026) ("The Court repudiated such theories in *Alliance*, rejecting the proposition that 'standing exists when an organization diverts its resources in response to a defendant's actions.'" (quoting *Alliance*, 602 U.S. at 395)).; *Farm Sanctuary v. USDA*, No. 24-382-cv, 2026 WL 1030616, at *2 (2d Cir. Apr. 16, 2026) (after *Alliance*, holding that "the diversion of an organization's resources or frustration of its mission" is "inadequate to establish standing"). Rather, as the Supreme Court explained, Plaintiff's voluntary decision to "divert resources . . . to counteract" Defendant's action cannot manufacture standing, as "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to

gather information and advocate against the defendant's action." *Alliance,* 602 U.S. at 394–95; Am. Compl. ¶ 13.

Nor is Plaintiff's perfunctory allegation of "frustrat[ion to] NTEU's ability to provide counseling and representation to its member[ship]" sufficient to give rise to a direct harm. Am. Compl. ¶ 13. Plaintiff makes no effort to explain how, outside of its own election to "divert resources . . . to counteract" Defendants' actions, Defendants have "frustrate[d] NTEU's ability to provide counseling and representation to its members." *See id.* ¶¶ 13, 103. Indeed, the only allegation that might conceivably affect NTEU's counseling and representation is the voluntary diversion of resources by NTEU to "counteract," "fight[]," and "educat[e] its members." *Id.* But courts routinely reject such arguments. *See, e.g., Smart Approaches to Marijuana v. Kennedy*, 835 F. Supp. 3d 37, 54–55 (D.D.C.) (finding no-injury-in-fact when plaintiffs "claim[ed] that they diverted resources in response to" defendants actions), *appeal filed*, No. 26-5205 (D.C. Cir. June 8, 2026); *Farm Sanctuary*, 2026 WL 1030616 at *2 ("Both the Supreme Court and this Court have held that these types of injuries—the diversion of an organization's resources or frustration of its mission—are inadequate to establish standing."); *Alliance,* 602 U.S. at 395.

**Alleged Harm to NTEU's Mission.** NTEU also briefly alleges it suffered a "direct[]" harm due to Defendants' frustration of its mission, alleging the "acts described [in the Amended Complaint] have injured NTEU's interest in protecting its members from arbitrary, capricious and other wrongful agency actions." Am. Compl. ¶¶ 12–13. This theory of standing is similarly insufficient. *See Alliance*, 602 U.S. at 394 (holding the argument that defendant had "impaired their ability to provide services and achieve their organizational missions . . . does not work to demonstrate standing." (internal citation omitted)). While organizations may have standing to challenge parties that "directly affected and interfered with [the organization's] core business activities," NTEU's barren allegations do not satisfy this requirement. *See id.* at 395–96.

As an initial matter, NTEU does not explain how Defendants' actions impaired a core activity of their union; nor could they. On its website, Plaintiff asserts that it is a "voice of the federal workforce" that represents employees "on Capitol Hill, in the courts, at the bargaining table

and in the media." *See* NTEU, *Who We Are, What We Do*, https://perma.cc/H2YM-GHFK.[4] If Plaintiff claims that Defendants' actions forced Plaintiff to engage in the very type of activities it was created for, such as advocating for its political positions or educating and counseling its members about regulatory changes, this is not a recognizable harm. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (rejecting standing when injuries were based on "issue advocacy"); *Env't Working Grp. v. U.S. FDA*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) (rejecting standing when the alleged harm was the need to engage in activities that were "exactly what these organizations always do."); Am. Compl. ¶¶ 96–100 (alleging harm due to NTEU engaging in issue advocacy, evaluation and educational activities). Indeed, in *Alliance,* the Supreme Court rejected standing based on allegations starkly similar to NTEU's, holding that an argument that an agency "impaired" an organization's "ability to provide services and achieve their organizational missions . . . does not work to demonstrate standing." *See* 602 U.S. at 394. Accordingly, the alleged harm to NTEU's mission cannot support standing.

## II. PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE CIVIL SERVICE REFORM ACT.

Even if Plaintiff had Article III standing, Plaintiff cannot meet its burden to demonstrate subject-matter jurisdiction because Congress has channeled jurisdiction over federal employment matters like the suit Plaintiff brings away from district courts, thus precluding jurisdiction here. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*") (ordering a jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme). The legal basis for this exclusive channeling is both well-settled and constitutionally significant. "Congress, subject only to Article III of the Constitution, establishes the jurisdiction of the inferior federal courts." *Am. Life League, Inc. v. Reno*, 47 F.3d

[4] "[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019) (Jackson, K.B., J.) ("[F]actual allegations receive 'closer scrutiny' in the 12(b)(1) context than in the 12(b)(6) context." (quoting *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015)).

642, 648 (4th Cir. 1995). Accordingly, Congress has great leeway to expand or restrict that jurisdiction, which it has exercised here by creating an exclusive administrative scheme for claims like Plaintiff's.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331[]." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from seeking relief through a suit in district court. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). Such is the case with the CSRA. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 8 (2012) (CSRA precludes constitutional claims); *AFGE v. Trump*, 929 F.3d at 756 (CSRA precludes APA claims).

Congress can preclude district court review in two different ways. The first is explicitly. *Axon*, 598 U.S. at 185 ("[P]roviding in so many words that district court jurisdiction will yield."). The second, applicable here, is implicitly. In the latter case, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Id*. To resolve an implicit preclusion question, the Court must determine whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Applying the two steps of the *Thunder Basin* analysis of implied preclusion here, jurisdiction over Plaintiff's claims is precluded.

**A. Congress intended to preclude district court jurisdiction.**

The first step of the *Thunder Basin* analysis, Congress's intent to preclude, is easily satisfied: Congress established a detailed statutory scheme for adjudicating disputes relating to federal employment. Taken as a whole, the CSRA provides "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal

employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988) (analyzing the CSRA). It provides for "administrative and judicial review" regarding disputes between employees or unions and the federal government. *AFGE v. Trump*, 929 F.3d at 752; *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (discussing the CSRA more broadly). Accordingly, federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the MSPB for employment disputes or the Federal Labor Relations Authority ("FLRA") for labor disputes. Judicial review, if any, is generally available only in a court of appeals. *See AFGE v. Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" for an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what Congress elected for this scheme. Accordingly, as the D.C. Circuit has repeatedly recognized, the CSRA precludes jurisdiction in the district courts over federal employee and federal union disputes. *See AFGE v. Trump*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) ("*Air Force*")). Indeed, the Supreme Court has already held that the scheme "foreclose[s] judicial review" for employees "to whom the CSRA grants administrative and judicial review." *Elgin*, 567 U.S. at 11 (emphasis omitted).

Of course, Plaintiff is not an employee subject to a possible reclassification or otherwise affected by the Policy/Career Executive Order and its implementation. But that is no matter. The "deliberate exclusion of [a group] from the provisions establishing administrative and judicial review for personnel action of the sort at issue . . . prevents [the group] from seeking review." *Fausto*, 484 U.S. at 455; *see also Block v. Community Nutrition Inst.*, 467 U.S. 340, 346–47 (1984) (similar). *Elgin* is instructive. In *Elgin,* the Supreme Court applied *Thunder Basin* to the CSRA and

explained that "the CSRA's 'elaborate' framework . . . demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review." *Elgin*, 567 U.S. at 11 (quoting *Fausto*, 484 U.S. at 443) (emphasis omitted). Thus, if it is true that the CSRA excludes administrative review options for Plaintiff, it supports, rather than detracts from, evidence of Congress's intent to preclude. *See Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

Unsurprisingly, given the clear congressional intention, a CSRA-related challenge rarely focuses on this first step of the *Thunder Basin* analysis. *See AFGE v. Trump*, 929 F.3d at 755. Through the reticulated administrative scheme Congress intended the CSRA to foreclose judicial review. "[T]his comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (citation omitted); *see also Elgin*, 567 U.S. at 8 (CSRA also precludes constitutional claims). That satisfies the first *Thunder Basin* step.

Rather, courts focus on the second portion of the *Thunder Basin* analysis, whether particular claims in a suit are of the type Congress intended to be reviewed in the scheme, in other words, whether "Congress's creation of a 'comprehensive review process' like [this] one[] here ousted district courts of jurisdiction." *See Axon*, 598 U.S. at 186 (citation omitted). Under this analysis, this Court must "ask[] another question: whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* (citation omitted). As explained below, the relevant claims were intended to be reviewed within the CSRA's statutory structure, and as a result, consideration of these claims is precluded.

**B. These claims are the type Congress intended to be reviewed through the CSRA's administrative scheme.**

Plaintiff's claims are the type of claims Congress intended to be reviewed through the CSRA's administrative scheme. To determine whether Congress's preclusion scheme reaches these

claims, the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim;" (2) "is the claim wholly collateral to the statute's review provisions;" and (3) "is the claim outside the agency's expertise?" *Id.* (cleaned up). These "considerations" are ultimately guideposts to "best . . . understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim." *Id.* Critically, APA and constitutional claims are as amenable to channeling as any other type of claim. *See, e.g.*, *Elgin*, 567 U.S. at 8; *Filebark*, 555 F.3d at 1010. It is the content of the claim that matters—not the manner in which a plaintiff attempts to raise it.

Here, Plaintiff brings five claims. In Count 1, Plaintiff alleges that designating certain positions under Schedule Policy/Career exceeds the authority provided by the CSRA and is ultra vires. *See* Am. Compl. ¶¶ 107–11. In Count II, Plaintiff alleges that designating certain positions under Schedule Policy/Career violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution and is ultra vires. *See id.* ¶¶ 114–16. In Counts III and IV, Plaintiff alleges that the Final Rule is inconsistent with the CSRA and exceeds Defendants' authority under the law in violation of the APA, 5 U.S.C. § 706(2)(A), (B), by excluding designated positions from certain civil service protections. *See id.* ¶¶ 117–20 (Count III); *id.* ¶¶ 121–25 (Count IV). In Count V, Plaintiff alleges that the Final Rule is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). *See id.* ¶¶ 127–29.[5] Applying the *Thunder Basin* factors compels a determination that Congress intended all these claims to be reviewed through the CSRA's administrative scheme.

**The first *Thunder Basin* factor favors preclusion.** The administrative scheme under the CSRA provides for meaningful judicial review. This is true even if the scheme Congress established does not allow for Plaintiff "to obtain 'pre-implementation' review" "or immediate relief." *See AFGE v. Trump*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes

[5] The Amended Complaint, ECF No. 30, misnumbers paragraphs 128 and 129 as paragraphs 108 and 109 respectively. For purposes of this Motion, the relevant paragraphs are cited as paragraphs number 128 and 129.

of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756 (emphasis in original).

*AFGE v. Trump* is instructive. In *AFGE v. Trump*, the D.C. Circuit ordered jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme, explaining it suffices that certain parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757. The same logic compels preclusion of Plaintiff's claims. Here, the Special Counsel may file a complaint that requires MSPB review; a party may petition the MSPB for review; and a reviewable final order may be reviewed under Section 7703. *See* 5 U.S.C. §§ 1204(f), 7703. That Congress made some access discretionary, and limited judicial review to specified persons and circumstances, reflects deliberate design—not a deficiency that licenses a new district-court path.

Indeed, all of Plaintiff's claims fit within the CSRA's administrative scheme. Plaintiff's claims are divided into two basic categories and challenges to both categories of claims may be made within the administrative scheme. *First*, Plaintiff brings claims asserting the Final Rule and Schedule Policy/Career violate the CSRA or APA. *See* Am. Compl. ¶¶ 107–11 (Count I, ultra vires in violation of CSRA); *id.* ¶¶ 117–20 (Count III, APA claim for exceeding authority under CSRA); *id.* ¶¶ 121–25 (Count IV, alleged violations of APA due to violations of due process); *id.* ¶¶ 126–29 (Count V, APA claim that Final Rule was arbitrary and capricious). It is well-established that an employee may challenge an employment action as conflicting with a federal rule, guidance, or statute within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 560 (D.C. Cir. 2023) ("*FLEOA*") (noting challenges to OPM guidance and rules through the MSPB system). *Second*, Plaintiff asserts challenges that address the constitutionality of the employment actions that were taken. *See* Am. Compl. ¶¶ 112–16 (Count II, due process claim concerning the President's Policy/Career Orders); *id.* ¶¶ 121–25 (Count IV, alleged violations of APA due to violations of due process). These types of challenges may also be

brought within the administrative scheme. *See Elgin*, 567 U.S. at 16–17 ("That issue, . . . could be meaningfully addressed in the Court of Appeals that Congress had authorized to conduct judicial review." (citation omitted)).

In fact, the Federal Circuit specifically considered, on appeal from the MSPB, whether a position was validly designated as "confidential, policy-determining, policy-making, or policy-advocating [in] character." *Stanley v. DOJ*, 423 F.3d 1271, 1273 (Fed. Cir. 2005). And the ultra vires claims in Counts I (contrary to congressional intent of CSRA) and II (alleged violations of accrued and vested rights) and administrative law claims in Counts III (conflicts with prior administration's interpretation of the CSRA), IV (alleged violations of APA due to violations of due process) and V (arbitrary and capricious) fall comfortably within the court's authority to "review the record and hold unlawful and set aside any agency action, findings, or conclusions" that are "obtained without procedures required by law, rule, or regulation having been followed" or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 7703(c)(1), (2); Am. Compl. ¶¶ 104–11 (Count I); *id.* ¶¶ 112–16 (Count II); *id.* ¶¶ 117–20 (Count III); *id.* ¶¶ 121–25 (Count IV); *id.* ¶¶ 126–29 (Count V). In sum, there are certain methods, for certain parties, to obtain certain relief on these very topics. That is all *Thunder Basin* requires. *AFGE v. Trump*, 929 F.3d at 756–57.

That separate organizations outside of the direct employee-employer relationship, like NTEU, may not be included in these pathways is of no issue. "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong." *Sackett v. EPA*, 566 U.S. 120, 130 (2012) (emphasis in original); *see Block*, 467 U.S. at 346–47 (similar). Indeed, "[w]ere [the Court] to hold otherwise, a union local could circumvent the CSRA's strictures by requesting that a national union file general APA claims outside the CSRA on its behalf." *See Air Force*, 716 F.3d at 639. And it would be natural for Congress to preclude those not directly involved in the federal employment relationship—whether they be nonaffiliated third-party entities, advocacy organizations with

current federal employees as members, or unions—from filing a separate attack on employment policies. "Nothing about the fact that plaintiff['s] action is a systemic challenge to [personnel] policy mitigates" this preclusion. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (Roberts, J.) (holding APA challenge to OPM policy was precluded). Rather, Plaintiff cannot evade administrative channeling here simply "because it is not their preferred remedial path." *New York v. Trump*, 181 F.4th 132, 141 (D.C. Cir. 2026).

**The second *Thunder Basin* factor favors preclusion.** The asserted claims are not wholly collateral to the CSRA's system of review. Under *Thunder Basin*, the Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. In *Axon*, the Supreme Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were the claims related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* Instead, the plaintiffs claimed the insulation of certain administrative law judges from removal violated the separation of powers. *Id.* at 182–83. Because the plaintiffs brought structural constitutional challenges alleging they were "subject[] to an illegitimate proceeding, led by an illegitimate decisionmaker," *id.* at 191, the Supreme Court determined that the second *Thunder Basin* factor pointed toward allowing district court review, *id.* at 192–93.

No such separation between the subject matter of Defendants' actions and Plaintiff's claims exists here. All of Plaintiff's claims revolve around whether Defendants' actions in issuing the Final Rule and implementing Schedule Policy/Career violate the CSRA, the APA, or the Due Process Clause, and as a result, none is collateral to the CSRA's system of administrative review of employment claims.

Further, when making a claim that is collateral to a second claim in litigation, a litigant does not rely on the merits of his arguments as to the second claim. For example, in the criminal context, a defendant's claim that the indictment should be dismissed on double jeopardy grounds is collateral to, and does not rely on, the defendant's claims about his guilt or innocence. As the Supreme Court explained, "[i]n arguing that the Double Jeopardy Clause of the Fifth Amendment bars his prosecution, the defendant makes no challenge whatsoever to the merits of the charge against him. Nor does he seek suppression of evidence which the Government plans to use in obtaining a conviction. Rather, he is contesting the very authority of the Government to hale him into court to face trial on the charge against him. The elements of that claim are completely independent of his guilt or innocence." *Abney v. United States*, 431 U.S. 651, 659–60 (1977) (internal citations omitted).

As noted *supra* at 23–24, questions about whether an employment action conflicts with statute or violates due process can be resolved through the CSRA's administrative scheme. Plaintiff's claims seek to challenge Defendants' actions as conflicting with the substantive requirements of reclassification; due process requirements for employment relationships; and whether the challenge actions violate the CSRA. But the OSC and MSPB are well versed in these questions too, including the particulars of classification and the interplay of federal employment authorities. Plaintiff's claims thus lie at the heart of the CSRA and are not collateral to its administrative scheme. *Accord New York*, 181 F.4th at 141 (states' claim did not involve a structural constitutional issue that would normally be resolved by courts, and "fit[] squarely within the statutory review scheme"). In fact, Plaintiff seeks the very relief the MSPB may supply, and in the context Congress specified: invalidation of an OPM regulation, or of its implementation, insofar as it requires prohibited personnel practices. *See* 5 U.S.C. § 1204(f)(2)–(3). Accordingly, the second *Thunder Basin* factor weighs against district court review.

**The third *Thunder Basin* factor favors preclusion.** The agency may bring its expertise to bear on many of the questions raised by this suit. The OSC and MSPB specialize in prohibited personnel practices, merit-system principles, adverse actions, and civil-service implementation—

exactly the types of issues that future plaintiff might seek to raise as to Schedule Policy/Career. And Plaintiff's constitutional labels do not change the analysis. Indeed, the Supreme Court directly addressed this question in *Elgin*. As the Supreme Court explained: "preliminary questions unique to the employment context" include fact questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the agency, these "threshold questions" may "alleviate [the other] concerns." *See id.* Moreover, "at *Thunder Basin* step two, the presumption is that a statutory review scheme is exclusive with respect to claims within its scope," *New York*, 181 F.4th at 142, and nothing concerning Plaintiff's claims suggests that presumption should be overcome.

### C. Plaintiff's claims are precluded under *Thunder Basin* and its progeny.

As all the *Thunder Basin* guideposts demonstrate Congress's intent to preclude these kinds of claims from district court review, Congress channeled these types of claims through the CSRA. The fact that *this* Plaintiff may be unable to challenge these particular claims in this specific type of way does not compel a different result. Rather, Congress intentionally may not have provided certain parties, removed from the direct employment relationship, a pathway to challenge certain employment and labor policies.

Indeed, several district courts have recently examined challenges to the legality of new employment policies by the Executive Branch and have consistently rejected them under the *Thunder Basin* inquiry. This includes, for example, a broad APA challenge to the legality of the policies underpinning the "Deferred Resignation Program." *See Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025), *appeal docketed*, 25-1959 (1st Cir. Oct. 15, 2025); *see also Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 5 (D.D.C. 2025) (finding implied preclusion for "constitutional and statutory challenges to the firing of probationary employees, the deferred resignation program, and [an] Executive Order"); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 20–24 (D.D.C. 2025) (same for "alleged unlawful dismantling of USAID" because "the alleged injuries on which plaintiffs rel[ied]

in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID" (cleaned up)).

Although district courts have permitted some non-employee plaintiffs to bring suit despite the CSRA's claim channeling, these cases are easily distinguishable from the claims at issue. In *American Federation of Government Employees, AFL-CIO v. U.S. Office of Personnel Management*, a group of public-sector unions and private organizations argued that OPM had no authority to direct federal agencies to terminate certain federal probationary employees. *See* 771 F. Supp. 3d 1127, 1131 (N.D. Cal. 2025), *appeal filed*, No. 25-5875 (9th Cir. Sep. 18, 2025). The court granted a preliminary injunction, *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 770 F. Supp. 3d 1215 (N.D. Cal. 2025), which the Supreme Court stayed pending resolution of the government's appeal, *OPM v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 1914 (2025) (mem). In *AFGE v. OPM*, the district court eventually determined the *Thunder Basin* factors weighed against preclusion of the unions' claims because: (i) the general claims about the limits of OPM's authority were outside the MSPB's and FLRA's respective expertise; (ii) the structural constitutional claims were wholly collateral; and (iii) the OPM Acting Director had stated that the terminations of probationary employees were "unreviewable through the MSPB," and had no prospect of review through the FLRA. 771 F. Supp. 3d at 1132–34. As explained above, this reasoning cannot apply to Plaintiff's claims. *See supra* at 22–27.

In a similar case, the district court granted a preliminary injunction requiring the Government, *inter alia*, to reinstate the probationary employees that resided or worked in the plaintiff states. *Maryland v. USDA*, 777 F. Supp. 3d 432, 494 (D. Md. 2025) ("*USDA*").[6] However, that injunction was subsequently stayed by the Fourth Circuit, *see Maryland v. USDA*, Nos. 12-1248, 12-1338, 2025 WL 1073657, at *1 (4th Cir. Apr. 7, 2025), and the matter was eventually

[6] In *USDA*, the court focused upon the fact that each of the plaintiffs were state governments explaining that "the States' harms were sufficiently distinct from the employee- and union-focused harms Congress intended to channel away from the district courts" and emphasizing that "[t]he CSRA is not about where *States* may go to press wholly distinct claims based on wholly distinct injuries." 777 F. Supp. 3d at 463–64 (emphasis in original). Given this focus, the district court's reasoning is inapplicable to the case at hand. *See supra* at 25–26.

dismissed for lack of a cognizable and redressable injury, *see Maryland v. USDA*, 151 F.4th 197, 208 (4th Cir. 2025).

*American Federation of Government Employees, AFL-CIO v. Kupor*, Civ. A. No. 25-13305-GAO, 2026 WL 2676621 (D. Mass. Sep. 11, 2026) ("*AFGE v. Kupor*"), is similarly inapplicable. In *AFGE v. Kupor*, when rejecting a channeling argument and determining that the claims were wholly collateral, the district court focused upon the fact that there was "no personnel practice at issue." *Id*. at *9 (citation omitted). In the case at hand, in contrast to the allegations in *AFGE v. Kupor*, Plaintiff challenges the change of designation of federal employees, a personnel practice that is properly channeled through the CSRA. *See supra* at 22–27.

Even more glaringly, the district courts in *AFGE v. OPM* and *USDA* rejected channeling arguments partly under the mistaken impression that a party not included in an exclusive statutory scheme must be able to avoid it. *See USDA*, 777 F. Supp. 3d at 462–63; *AFGE v. OPM*, 771 F. Supp. 3d at 1135. But that premise is incorrect. As then-Judge Roberts explained for the D.C. Circuit in *Graham*, the CSRA in some circumstances will properly provide a plaintiff "no relief and preclude[] other avenues of relief." 358 F.3d at 935. There, for example, the aggrieved employee lacked any recourse for an alleged failure of the agency to follow its own regulations. *Id.* And Judge Tatel similarly explained in *Filebark* that the CSRA precluded "use [of] the APA to litigate [a] pay dispute with the Federal Aviation Administration" even though "the CSRA provide[d plaintiffs] no protection." 555 F.3d at 1010. This is not a bug of the CSRA. It is an intended feature. "[W]e treat the CSRA and Congress's related employment statutes as covering the field of federal employee claims, and so our cases expressly teach that *those left out of this scheme are left out on purpose*." *Id.* at 1014 (emphasis added); *accord Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts . . . [it] may not raise the claim at all.").

The APA confirms this channeling. Section 704 authorizes review of agency action made reviewable by statute and of final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Congress addressed the relevant agency action through a specific

structure—MSPB regulation review of OPM rules issued under § 1103, *see id.* § 1204(a)(4), (f), followed, where available, by § 7703 review. Plaintiff cannot invoke the APA to replace that scheme with immediate district-court litigation.

*FLEOA* is directly instructive. There, the D.C. Circuit held that a group could not avoid the CSRA review path by styling a systemwide challenge to OPM policy as an APA suit, explaining that the APA may not be used to bypass the civil-service remedial regime for claims of the type Congress intended to be reviewed within the scheme. *See FLEOA*, 62 F.4th at 559–64. The same is true here: Plaintiff challenges OPM civil-service regulations and the asserted loss of civil-service protections—matters Congress assigned to the CSRA's administrative and judicial-review channels. The applicability of the CSRA administrative and judicial-review channels to Plaintiff's claims is further reinforced by *Elgin*, in which the Supreme Court explained that the CSRA scheme is exclusive even for many constitutional challenges and emphasized the statute's comprehensive design and the primacy of MSPB and Federal Circuit review. 567 U.S. at 10–23. It is also reinforced by *Fausto*, where the Supreme Court held the CSRA's comprehensive structure can preclude alternative judicial review where Congress withheld or limited review for particular matters. 484 U.S. at 448–55.

For these reasons, Plaintiff's claims in federal district court are precluded by the CSRA and should be dismissed. *See Thunder Basin*, 510 U.S. at 207, 212, 218.

## III. ALL CLAIMS AGAINST THE PRESIDENT, AND ALL CLAIMS RELATING TO THE PRESIDENT'S EXERCISE OF HIS STATUTORY DISCRETION, SHOULD BE DISMISSED.

Even if Plaintiff could overcome every other jurisdictional problem in this case, at a minimum, this Court should dismiss: (1) all claims against the President of the United States (and thus dismiss the President as a defendant) and (2) all claims (and requests for relief) as to the President's exercise of his statutory discretion (including claims against the other Defendants). For example, to the extent that any of Plaintiff's claims are based on the President's issuance of Executive Order 14,410 to identify positions to place into the new Schedule Policy/Career, those

claims fail for lack of jurisdiction. Similarly, there is no jurisdiction to support the relief that Plaintiff request as to the President's exercise of his discretion in Executive Order 14,410, *see* Am. Compl., Request for Relief at (B), (D)–(E).[7]

This result follows directly from binding precedent. Although courts often review agency implementation of Executive Orders relating to the exercise of authority vested by Congress in a subordinate agency official, this case presents a different fact pattern: statutory authority that Congress authorized *the President* to directly exercise himself. And "[w]here a statute . . . commits decision-making to the discretion of the President, judicial review of the President's decision is not available." *Dalton*, 511 U.S. at 477.

**A. None of the relief that Plaintiff seeks is available against the President, so he should be dismissed as a Defendant in this case.**

*First*, Plaintiff cannot sue the President under the APA because "the President is not an agency within the meaning of the" APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) ("[B]ecause 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework." (quoting *Franklin*, 505 U.S. at 796)), *aff'd*, 2026 WL 1991571 (D.C. Cir. July 2, 2026).

*Second,* the Court's equitable authorities are likewise unavailable as applied to the President. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And at least outside of the narrow context of principal officer removal challenges, *see generally Trump v. Cook*, 609 U.S. 528 (2026), there is no tradition of equitable

---

[7] Defendants bring this argument under Federal Rule of Civil Procedure 12(b)(1). If the Court concludes this argument is not jurisdictional, Defendants alternatively advance the same argument under Federal Rule of Civil Procedure 12(b)(6).

relief against the President. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' . . . This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (citations omitted)).

To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866). The Supreme Court reaffirmed that principle in *Franklin*, when declining to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." 505 U.S. at 800–01. That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive "relief are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). And the narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court can compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). But the acts of the President here are clearly not "ministerial." *Mississippi*, 71 U.S. at 498.

As none of the relief Plaintiff requests here would properly run against the President, he should be dismissed as a Defendant. *See, e.g.*, *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018) ("Given that the Court will not grant Plaintiffs the relief that they seek against the President himself, the President should be dismissed.").

**B. The President's exercise of his own statutory discretion is not reviewable.**

Even in the absence of direct relief against the President, courts often exercise judicial review of actions by *subordinate* agency officials, exercising *their* congressionally delegated authority—including where the President has directed the exercise of that authority, such as by Executive Order. *See, e.g.*, *Glob. Health Council v. Trump*, 153 F.4th 1, 17 n.14 (D.C. Cir. 2025) ("Presidential action may be reviewed through APA challenges to final agency action by subordinates implementing the President's directives where such review is not otherwise precluded."), *denying reh'g en banc*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025).

This case is different than this typical fact pattern, though, because it is (at least in substantial part) about statutory discretion that Congress authorized *the President himself* to exercise directly. Accordingly, in addition to dismissing all claims against the President (and thus dismissing the President as a Defendant), the Court should also dismiss *all* claims relating to the President's exercise of his own statutory discretion—that is, all claims (and requests for relief) relating to Executive Order No. 14,410, including claims against the other Defendants. That result follows directly from the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994).

In *Dalton*, the plaintiffs "sought to enjoin the Secretary of Defense . . . from carrying out a decision by the President to close the Philadelphia Naval Shipyard." *Id.* at 464. The plaintiffs argued that the Secretary of Defense and others had violated the statutory requirements for recommending such closures to the President, and that the President himself had violated statutory constraints in *accepting* those allegedly unlawful recommendations. *See id.* at 466; *id.* at 468 (explaining that the Court of Appeals had "adjudg[ed] the President's actions for compliance with the 1990 Act"); *id.* at 474 ("The President is said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations."). The Supreme Court rejected review of the

President's discretion and squarely held that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [this Court's] review." *Id.* at 476. And so, after *Dalton*, it is settled that "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477.

That holding controls here, at least with respect to all claims relating to the President's exercise of his own statutory discretion—that is, all claims relating to Executive Order No. 14,410. Congress authorized the President to "prescribe rules governing the competitive service." 5 U.S.C. § 3302. And Congress likewise explicitly authorized the President to provide for "necessary *exceptions* of positions from the competitive service." *Id.* § 3302(1) (emphasis added). And were there any doubt, *id*. § 7511(b)(2)(A), explicitly states that certain civil-service protections "do[] not apply to an employee . . . whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by . . . the President for a position that the President has excepted from the competitive service." Those are the very authorities invoked by the President in Executive Order 14,410. *See Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14,410, 91 Fed. Reg. 34,893 (June 3, 2026) ("By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 3301, 3302, 5595 and 7511 of title 5, United States Code, it is hereby ordered . . .").

Nor can Plaintiff challenge the President's exercise of his own statutory discretion indirectly through claims against OPM. At least with respect to the President's policy decisions reflected in Executive Order 14,410, OPM's role is simply to effectuate those Presidential decisions. And where, as here, an agency is carrying out "action on behalf of the President, involving discretionary authority committed to the President," that action is equally "'presidential' and unreviewable under the APA." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402–03 (D. Md. 2011) (similar), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18,

28–29 (D.D.C. 2001) (similar, as to action by the Forest Service "carrying out directives of the President"), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).

In sum, under *Dalton* and its progeny, "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [this Court's] review." 511 U.S. at 476. That is fatal to all of Plaintiff's claims (against any Defendants) relating to the President's discretionary decisions in Executive Order 14,410 as to which employees should be "except[ed] . . . from the competitive service," 5 U.S.C. § 3302(1), because their "position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by . . . the President," *id.* § 7511(b)(2)(A).

**C. Plaintiff cannot evade these limitations by bringing an ultra vires claim.**

Plaintiff cannot evade these limitations on review by invoking the ultra vires doctrine. An ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681–82 (2025) ("*NRC*") (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). "Only error that is patently a misconstruction of the [statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). And "an agency violates a 'clear and mandatory' statutory command only when the error is 'so extreme that one may view it as jurisdictional or nearly so.'" *Id.* (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Even then, "[u]ltra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681 (citation omitted).

Plaintiff's allegations are far from the required "extreme" error. Instead, Plaintiff offers no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim. *Id.* at 682. In any event, this form of statutory "ultra vires review is not available

because" Plaintiff also has "an alternative path to judicial review" through administrative channels. *Id.*; *see supra* at 22–25 (discussing available forms of review).

Nor can Plaintiff repackage alleged statutory violations as constitutional claims to evade these limits on ultra vires review. As discussed above, *see supra* at 23–26 (discussing Plaintiff's allegations as to due process), and as *Dalton* itself confirms, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472 (collecting cases); *accord Glob. Health Council*, 153 F.4th at 16 ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."). That principle is likewise fatal to any ultra vires claim here.

**CONCLUSION**

This case should be dismissed, in its entirety, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). To the extent the Court determines any of the arguments above is not jurisdictional in nature, the Court should still dismiss the case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Dated: October 7, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Connor J. Ritschard*
CONNOR J. RITSCHARD
N.Y. Bar No. 5849187
Trial Attorney
STEPHEN M. PEZZI
D.C. Bar No. 995500
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 451-7745
E-mail: Connor.J.Ritschard@usdoj.gov

*Counsel for the United States*